**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 22, 2003**

MARCIA SNIECINSKI,

    Plaintiff-Appellee,

v

        No. 119407

BLUE CROSS AND BLUE SHIELD
OF MICHIGAN,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH.**

**CORRIGAN, C.J.**

    In this pregnancy discrimination case, we have been asked to decide whether the trial court erred by denying defendant Blue Cross and Blue Shield of Michigan's (BCBSM) motions for directed verdict and judgment notwithstanding the verdict. We hold that because plaintiff failed to adduce evidence of a causal connection between her pregnancy and BCBSM's failure to hire her, BCBSM was entitled to a finding of no cause of

action as a matter of law. The trial court erred by denying defendant's motions for directed verdict and judgment notwithstanding the verdict.

## I. Underlying Facts and Procedural History

Blue Care Network of East Michigan (BCN), a wholly owned subsidiary of BCBSM, employed plaintiff as a telemarketing representative. Plaintiff, a high school graduate, began work at BCN's predecessor, Group Health Services (GHS), in 1983. She held a variety of positions. In 1987, she became a telemarketing representative. In 1989, GHS merged into BCN. BCN honored the seniority that plaintiff had acquired at GHS. Also in 1989, plaintiff became pregnant. She experienced pregnancy complications that required her to take a medical leave for seven months. In October of that year, plaintiff gave birth to her daughter. In November, she returned to work for BCN.

Plaintiff became pregnant again in 1992 while she was supervised by Michael Curdy. Plaintiff testified that after she informed Curdy about her pregnancy, he seemed upset. He referred to plaintiff's chair as the "pregnancy chair." He stated that he would not let anyone sit in that chair again. He asked plaintiff whether she was going to experience problems with her pregnancy as she had in 1989. Curdy further told plaintiff that he would not permit her to use either sick

time or unpaid leave because of her pregnancy.

In January 1993, Curdy placed a memo regarding plaintiff's attendance in her personnel file. When plaintiff learned about the memo, she complained to Patricia Stone, the Regional Human Resources Manager at BCN. Stone informed Curdy that he had not followed the appropriate procedure for discipline. She advised Curdy to follow the correct procedure to determine whether a problem existed regarding plaintiff's attendance before a disciplinary memo could be placed in plaintiff's file. Stone then removed the memo from plaintiff's file.

Plaintiff again experienced pregnancy complications that required her to take one week off from work in February 1993. During that time, she suffered a miscarriage. Plaintiff testified that upon her return to work Curdy spoke to her about future pregnancies and stated, "We'll have to deal with that problem when it comes."

During 1993, the marketing departments of BCN and BCBSM were merged. Because the merger was going to eliminate the telemarketing positions at BCN, BCN telemarketers seeking to continue their employment were required to interview for a position of account representative at BCBSM.

In August 1993, plaintiff interviewed for an account representative position with Donald Whitford, BCBSM Regional

Sales Director; Donald Roseberry, BCBSM Sales Team Manager; and Curdy.[1]  Plaintiff testified that Curdy asked about her time off from work related to her previous pregnancy complications.  He also asked whether plaintiff thought her pregnancies would be a future problem.  After a second interview with Whitford and Roseberry only, plaintiff was offered an account representative position at BCBSM.  Immediately thereafter, plaintiff told Whitford and Roseberry that she was pregnant.  Plaintiff testified that they "seemed surprised" and were "taken aback," but congratulated her.

Plaintiff and other BCN employees expecting to transfer to BCBSM continued to work for BCN until the merger.  Plaintiff testified that when Curdy heard about her pregnancy, he remarked, "I'll have to make sure I don't hire anybody in child bearing years in the future."  In September 1993, soon after receiving the job offer, plaintiff began experiencing pregnancy-related complications.  She was again required to take time off from work.  She remained on medical leave from September 1993 until May 1994, six weeks after giving birth to her son.

Shortly after plaintiff was offered the account representative position, Whitford and Curdy contacted Stone to

_____

[1] Although Curdy was a BCN employee at the time of the interview, he was slated to become the new team leader for BCBSM in the Flint region after the merger.

discuss placing a disciplinary note in plaintiff's file regarding her attendance problems during previous pregnancies. Stone testified that Whitford wanted Curdy's January 1993 memo put back in plaintiff's file because plaintiff was continuing to have attendance problems. Stone advised them that placing a memo in plaintiff's file was inappropriate.

On November 22, 1993, while plaintiff was on medical leave, the planned merger of the sales departments of BCN and BCBSM occurred, and all BCN employees who had been offered jobs with BCBSM terminated their employment with BCN and began working for BCBSM. Plaintiff did not report for work at BCBSM because she was on medical leave at that time. Instead, BCBSM held open an account representative position for her. On March 1, 1994, plaintiff's short-term disability benefits expired, and she began to collect long-term disability (LTD) benefits. Under BCN's LTD policy, an employee on medical leave converts from short-term to LTD status on the first day of the employee's sixth month off work. The LTD policy provides that the employee is separated from the company and issued a final pay check, including accrued vacation and personal time.

On October 11, 1993, while plaintiff was on short-term disability, she requested an extension of her medical leave. Plaintiff was concerned that the account representative

5

position at BCBSM would no longer be available when she was ready to return to work. Stone informed plaintiff that the position would be held open until plaintiff went on LTD, if plaintiff's medical leave extended that long. Stone's notations in her Franklin planner corroborated this account of her conversation with plaintiff. The notes read as follows:

> Marcia concerned over job security-
> Advised her that not issue until LTD
> If LTD -> Blue Cross job not possible.
> We will attempt to find position similar qualifications/pay.

Because plaintiff did not return to work before March 1, 1994, she began collecting LTD benefits. BCN issued plaintiff a vacation and incentive payout and separated her from the company.

In late May 1994, plaintiff informed BCBSM that she was ready to return to work. Because of the 1993 merger, her telemarketing position at BCN had been eliminated. The BCBSM account representative position previously offered to her was not filled because of a company-wide hiring freeze resulting from a loss of Medicare business.

Plaintiff thereafter collected unemployment benefits for six months while making periodic efforts to find another job. In December 1994, BCN offered, and plaintiff accepted, a position as a marketing representative that was unrelated to her previous job. After resuming work, plaintiff learned that

6

BCBSM had recently hired an account representative who was a college graduate. Both before and after the merger, the BCBSM account representative position required a college degree. The degree requirement had been waived only for those BCN employees transferring to BCBSM during the merger. Plaintiff had no college degree.

In March 1996, while still employed at BCN, plaintiff sued BCBSM, alleging sex (pregnancy) discrimination in violation of Michigan's Civil Rights Act (CRA), MCL 37.2101 *et seq*. In August 1996, plaintiff saw a posting for an account representative with BCBSM. The position still required a college degree. Upon her inquiry, the BCBSM human resources department informed her that the degree requirement could not be waived. On September 20, 1996, plaintiff resigned from her position with BCN. She did not seek employment, instead opting to enroll in college to attend classes part-time.

Plaintiff's lawsuit proceeded to trial. The jury rendered a verdict for plaintiff, awarding her $125,000 for past economic loss, $136,000 for future economic loss, and $90,000 in noneconomic damages. Defendant moved for judgment notwithstanding the verdict (JNOV), a new trial, and remittitur of plaintiff's economic damages. The trial court denied the motions. The Court of Appeals affirmed the

verdict.[2]  We granted BCBSM's application for leave to appeal.[3]

## II. Standard of Review

Defendant contends that the trial court erred by denying its motions for directed verdict or JNOV.[4]  We review de novo the trial court's denial of both motions.  *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998)*; Smith v Jones*, 246 Mich App 270, 273-274; 632 NW2d 509 (2001).  We "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party."  *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000); *Forge, supra* at 204, quoting *Orzel v Scott Drug Co*, 449 Mich 550, 557; 537 NW2d 208 (1995).  A motion for directed verdict or JNOV should be granted only if the evidence viewed in this light fails to establish a claim as a matter of law.  *Wilkinson, supra* at 391; *Forge, supra* at 204.

## III. Analysis

Section 202 of the CRA, MCL 37.2202, provides in part:

(1) An employer shall not do any of the following:

(A) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an

---

[2]  Unpublished opinion per curiam, issued March 9, 2001 (Docket No. 212788).

[3]  466 Mich 859 (2002).

[4]  Given our holding on this issue, we need not address BCBSM's remaining issues.

8

individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, *sex*, height, weight, or marital status. [Emphasis added.]

The CRA defines "sex," within the meaning of the above section, as "'[s]ex' includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth . . . ." MCL 37.2201(d). Plaintiff claims that defendant discriminated against her in violation of the CRA by refusing to hire her because she was pregnant.[5] Proof of discriminatory treatment in violation of the CRA may be established by direct evidence or by indirect or circumstantial evidence. *DeBrow v Century 21 Great Lakes, Inc (After Remand)*, 463 Mich 534, 539; 620 NW2d 836 (2001); *Harrison v Olde Financial Corp*, 225 Mich App 601, 606-607; 572 NW2d 679 (1997).

In cases involving direct evidence of discrimination, a plaintiff may prove unlawful discrimination in the same manner as a plaintiff would prove any other civil case. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). We have previously cited with approval the United States Court of Appeals for the Sixth Circuit's definition of "'direct

---

[5] The Court of Appeals improperly characterized plaintiff's claim as wrongful discharge. Plaintiff concedes that her claim stems from BCBSM's failure to hire her rather than from wrongful discharge.

evidence' as 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Hazle, supra* at 462, quoting *Jacklyn v Schering-Plough Healthcare Products Sales Corp*, 176 F3d 921, 926 (CA 6, 1999); *Harrison, supra* at 610.

In a direct evidence case involving mixed motives, i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a "substantial" or "motivating" factor in the decision. *Price Waterhouse v Hopkins*, 490 US 228, 244; 109 S Ct 1775; 104 L Ed 2d 268 (1989);[6] *Harrison, supra* at 612-613. In addition, a plaintiff must establish her qualification or other eligibility for the position sought and present direct proof that the discriminatory animus was causally related to the adverse decision. *Harrison, supra* at 612-613. Stated another way, a defendant may avoid a finding of liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the

---

[6] Although the United States Supreme Court's decision in *Price Waterhouse* involved title VII of the federal Civil Rights Act of 1964, 42 USC 2000e *et seq.*, its analysis is persuasive. We agree with *Harrison* that the reasoning of *Price Waterhouse* is applicable in cases arising under the CRA. See *Harrison, supra* at 612.

decision. *Price Waterhouse, supra* at 244-245.

In cases involving indirect or circumstantial evidence, a plaintiff must proceed by using the burden-shifting approach set forth in *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). *Hazle, supra* at 462; *DeBrow, supra* at 540. This approach allows "a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *DeBrow, supra* at 538. To establish a rebuttable prima facie case of discrimination, a plaintiff must present evidence that (1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) her failure to obtain the position occurred under circumstances giving rise to an inference of unlawful discrimination. *Hazle, supra* at 463; *Lytle v Malady (On Rehearing)*, 458 Mich 153, 172-173; 579 NW2d 906 (1998) (opinion by Weaver, J.); see also *McDonnell Douglas, supra* at 802.[7] Once a plaintiff has presented a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason

---

[7] As required by *Hazle* and *Lytle*, the elements of the *McDonnell Douglas* prima facie case are adapted to the present factual situation. The elements of a prima facie case under the *McDonnell Douglas* approach should be tailored to the facts and circumstances of each case. *Hazle, supra* at 463 n 6; see also *Lytle, supra* at 173 n 19 (opinion by Weaver, J.).

11

for the adverse employment action. *Hazle, supra* at 464; *Lytle, supra* at 173 (opinion by WEAVER, J.). If a defendant produces such evidence, the presumption is rebutted, and the burden shifts back to the plaintiff to show that the defendant's reasons were not the true reasons, but a mere pretext for discrimination. *Hazle, supra* at 465-466; *Lytle, supra* at 174 (opinion by WEAVER, J.).

Under either the direct evidence test or the *McDonnell Douglas* test, a plaintiff must establish a causal link between the discriminatory animus and the adverse employment decision. Because a prima facie case under the *McDonnell Douglas* test creates a presumption of unlawful discrimination, causation is presumed. *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 254; 101 S Ct 1089; 67 L Ed 2d 207 (1981). A defendant may rebut the presumption of causation by articulating a legitimate, nondiscriminatory reason for the employment decision. Under the direct evidence test, a plaintiff must present direct proof that the discriminatory animus was causally related to the adverse employment decision. *Price Waterhouse, supra* at 244-245; *Harrison, supra* at 612-613.

In support of her claim, plaintiff relied in part upon the following alleged statements regarding her pregnancies:

(1) Curdy referred to plaintiff's chair as the "pregnancy chair" and stated that he was not going to allow anyone else to sit in the chair;

12

(2) Curdy informed plaintiff that she would not be permitted to use sick time or unpaid leave in connection with her second pregnancy;

(3) When discussing possible complications with future pregnancies, Curdy stated, "We'll have to deal with that problem when it comes";

(4) Curdy asked plaintiff whether she was going to have complications with her second pregnancy "like she had in 1989";

(5) Curdy asked plaintiff about her pregnancy complications at the interview for the BCBSM account representative position; and

(6) Curdy stated that he would never hire anyone in child-bearing years again.

BCBSM argued that the above statements were merely "stray remarks" and not direct evidence of discrimination.[8] We need not determine whether the cited comments were mere "stray remarks." Regardless of whether these were "stray remarks" or direct evidence of a discriminatory animus, plaintiff failed as a matter of law to prove that the remarks were causally related to BCBSM's failure to hire her. Stated another way, plaintiff failed to establish causation under either the

---

[8] Factors to consider in assessing whether statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. *Cooley v Carmike Cinemas, Inc*, 25 F3d 1325, 1330 (CA 6, 1994); *Krohn v Sedgwick James, Inc*, 244 Mich App 289, 292; 624 NW2d 212 (2001).

13

*McDonnell Douglas* test or the direct evidence test.

BCBSM preserved its causation argument by raising it in both the motion for directed verdict and the motion for JNOV. The trial court did not specifically address BCBSM's causation argument in ruling on the motion for directed verdict. The court merely stated that reasonable minds could differ regarding the interpretation of the facts of this case. Further, the trial court failed altogether to address BCBSM's causation argument when deciding the JNOV motion.

Defendant presented evidence that plaintiff's job offer for an account representative position at BCBSM expired administratively because of the neutral operation of the LTD policy. Plaintiff produced no evidence that Curdy or Whitford manipulated the operation of that neutral policy to prevent BCBSM from hiring her because of her pregnancy. Human resources manager Stone's direct testimony and corroborative evidence established that BCBSM offered to hold the position open for plaintiff only until she went on long-term disability. Thereafter, the job was "not possible" by virtue of the neutral operation of the LTD policy and plaintiff's resulting separation from BCN. Plaintiff was informed of the terms of the LTD policy in October 1993, five months before she accepted LTD benefits.

When plaintiff was ready to return to work in May 1994,

her previous job at BCN no longer existed because the marketing departments had been unified and transferred to BCBSM. Under BCN's general practices, the company would attempt to place a former employee returning from long-term disability in her previous position or a comparable position, but BCN no longer had such a position because of the unification. In addition, it is undisputed that, at the time plaintiff was able to return to work, both BCN and BCBSM were in the midst of the hiring freeze precipitated by the loss of Medicare business.

Plaintiff argues that BCBSM should have hired her as an account representative in May 1994 because of her previous job offer. In addition, the dissent contends that BCBSM's failure to "rehire" plaintiff as an account representative is contrary to its custom of allowing an employee to resume a previous position upon return from disability status. In support of her argument, plaintiff produced evidence that eighty-nine other individuals returning from LTD status were returned to their previous jobs. That evidence is inapposite, however, because plaintiff did not seek to return to her *previous* job. Rather, she sought to begin new employment at BCBSM. The eighty-nine individuals to whom plaintiff refers had returned to the same company, either BCN or BCBSM, from which they were separated under the LTD policy. Neither BCN's general

practices nor the LTD policy required, or for that matter authorized, BCN to transfer a former employee to BCBSM, a separate corporate entity.  In short, plaintiff never worked for BCBSM, and she has not demonstrated a causal relationship between the alleged evidence of discriminatory animus and BCBSM's failure to hire her.

Plaintiff further argues that BCBSM kept her on BCN's payroll, thus forcing her to collect LTD benefits as a BCN employee rather than as a BCBSM employee.  In addition, she contends that BCBSM did not inform her that she would have had to come to work on November 22, 1993, the date of the unification, to fill out paperwork necessary to transfer her to BCBSM.  Plaintiff incorrectly assumes that merely filling out paperwork was sufficient to effect her transfer to BCBSM. Further, although plaintiff presented conflicting evidence on this point at trial, she now maintains that she was able to go to work on that day to fill out the paperwork notwithstanding her medical leave.

Plaintiff's arguments fail because she was required to begin working for BCBSM as an account representative in order to accept the job offer and become a BCBSM employee. Whitford testified that an individual becomes a BCBSM employee by reporting to work and performing the functions of the job, not by merely completing paperwork.  According to Whitford,

until a prospective employee reports to work and performs her job functions, a job offer is simply that—"strictly a job offer . . . ."[9]

Plaintiff did not report to work after the unification and before her separation from BCN. Thus, she never performed the functions of a BCBSM account representative to thereby accept the job offer. While plaintiff argued at trial that completing the paperwork was sufficient to execute her transfer, she offered no evidence in support of her argument.

---

[9] Whitford's testimony is consistent with the law regarding unilateral contracts. Generally, employment contracts are unilateral and may be accepted only by performance. *In re Certified Question*, 432 Mich 438, 445-447; 443 NW2d 112 (1989); *Cunningham v 4-D Tool Co*, 182 Mich App 99, 106-107; 451 NW2d 514 (1989).

> A unilateral contract is one in which the promisor does not receive a promise in return as consideration. 1 Restatement Contracts, §§ 12, 52, pp 10-12, 58-59. In simplest terms, a typical employment contract can be described as a unilateral contract in which the employer promises to pay an employee wages in return for the employee's work. In essence, the employer's promise constitutes the terms of the employment agreement; the employee's action or forbearance in reliance upon the employer's promise constitutes sufficient consideration to make the promise legally binding. In such circumstances, there is no contractual requirement that the promisee do more than perform the act upon which the promise is predicated in order to legally obligate the promisor. [*Certified Question, supra* at 446, citing *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579, 630-631; 292 NW2d 880 (1980) (separate opinion of RYAN, J).]

Rather, her argument was based wholly on speculation. Because plaintiff never accepted the job offer by working for BCBSM, she never became a BCBSM employee. She remained on BCN's payroll and collected LTD benefits as a BCN employee.

BCBSM held open the account representative position for plaintiff until she began collecting LTD benefits. When plaintiff contacted Stone because of concern about BCBSM filling the account representative position while she was on medical leave, Stone informed her that the job would not be "possible" if plaintiff went on long-term disability. Therefore, when plaintiff began accepting LTD benefits and was separated from BCN, the job offer expired under the terms of the neutral LTD policy.

Plaintiff did not show that she was treated differently from others under the LTD policy because of her pregnancy. She also did not show that Curdy, Whitford, or anyone at BCBSM or BCN manipulated the operation of the LTD policy to prevent her hire because she was pregnant. Rather, plaintiff relied on conjecture and speculation to support her claim that BCBSM failed to hire her because of an unlawful pregnancy animus. Mere speculation or conjecture is insufficient to establish reasonable inferences of causation. *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994).

Plaintiff failed to establish a causal nexus between her

18

pregnancy and the adverse employment action. Because the evidence, viewed in the light most favorable to plaintiff, fails to establish her claim as a matter of law, the trial court should have granted BCBSM's motion for a directed verdict or a JNOV. *Wilkinson, supra* at 391; *Forge, supra* at 204.

## IV. Conclusion

We conclude that because plaintiff failed to establish a causal connection between her pregnancy and BCBSM's failure to hire her, BCBSM was entitled to a finding of no cause of action as a matter of law. Given this holding, we need not address BCBSM's remaining issues. We reverse the judgment in favor of plaintiff and remand this case to the trial court for entry of judgment in favor of BCBSM.

> Maura D. Corrigan
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

CAVANAGH, J.

I concur in the result only.

> Michael F. Cavanagh

19

# S T A T E  O F  M I C H I G A N

## SUPREME COURT

MARCIA SNIECINSKI,

    Plaintiff-Appellee,

v                               No. 119407

BLUE CROSS AND BLUE SHIELD
OF MICHIGAN,

    Defendant-Appellant.

_____

**WEAVER, J.** (*concurring in part and dissenting in part*).

I concur with the majority to the extent that it reverses the trial court's decision to deny defendant's motion for directed verdict regarding plaintiff's noneconomic damages. As stated by Judge Sawyer, who concurred in part and dissented in part on the Court of Appeals panel below, "plaintiff failed to present any 'specific and definite evidence of mental anguish, anxiety or distress' as she was required to do."[1]

However, I disagree with the majority conclusion that plaintiff failed to establish a causal nexus between her

---

[1] Unpublished opinion per curiam, issued March 9, 2001 (Docket No. 212788), quoting *Wiskatoni v Michigan Nat'l Bank-West*, 716 F2d 378, 389 (CA 6, 1983).

pregnancy and the adverse employment action.[2]   Although plaintiff was told that if she went on long-term disability, the account representative job was "not possible," she was also reassured by defendant's management employees that she need not worry about her job opportunity.   Indeed, she was given the impression that her future transfer to BCBSM was essentially an administrative matter.  The record reveals that she was told that BCBSM "did not want to absorb the medical disability at that time . . . they wanted [her] to take the disability benefits through Blue Care Network and then once [she] was—six weeks after [she] had her child and returned to work [she] would be transferred to Blue Cross and Blue Shield . . . ."   In my view, this evidence provides a reasonable inference that the defendant's failure to hire plaintiff was causally connected to her pregnancy.

Regarding defendant's remaining issues on appeal, I would affirm the result and reasoning of the Court of Appeals majority.

Elizabeth A. Weaver

---

[2] As noted by the majority, *ante* at 9 n 9, the Court of Appeals mischaracterized plaintiff's claim as wrongful discharge rather than failure to hire.

MARCIA SNIECINSKI,

    Plaintiff-Appellee,

v                                       No. 119407

BLUE CROSS AND BLUE SHIELD
OF MICHIGAN,

    Defendant-Appellant.

_____

KELLY, J. (*dissenting*).

    In resolving this appeal for defendant, the majority interprets the facts in the light most favorable to defendant. It ignores the fact that the jury is entitled to infer causation from the proofs presented. Viewed properly, in the light most favorable to plaintiff, the facts support the jury's verdict. Therefore, I respectfully dissent.

I

    This Court reviews motions for a directed verdict or judgment notwithstanding the verdict by drawing all legitimate factual inferences in the light most favorable to the nonmoving party. *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). This rule reflects the longstanding understanding of our appellate courts that a jury's verdict should not be

lightly disturbed. However, the majority does just that, viewing the evidence that reached the jury through a distorted lens.

A plaintiff must convince a jury that he has satisfied each element of his cause. He may do that either with direct evidence or with evidence that permits the jury to infer the required conclusion. Here, the majority properly catalogues the discriminatory actions undertaken by Mr. Curdy, *ante* at 13, but ignores the jury's ability to infer that the same discriminatory animus caused plaintiff's job loss later. Rather, the majority simply concludes that the existence of defendant's long-term disability (LTD) policy made it unreasonable to conclude that plaintiff established causation and, therefore, plaintiff loses.

However, plaintiff presented abundant proof to create an inference regarding causation consistent with the jury's finding. The jury was entitled to believe that the facts precipitating the loss of her account representative position were an extension of the discriminatory animus to which defendant subjected plaintiff. Specifically, defendant's words and actions made it unclear whether it required plaintiff to report for work at defendant before the onset of LTD benefits.

Several important facts support the jury's conclusion.

2

First, defendant's management employees repeatedly assured plaintiff that her position would be available when she returned from medical leave. However, no one informed her that, to preserve her job, she would need to report to defendant before she began collecting LTD benefits. Instead of transferring her to defendant's medical leave roster on the date of the merger, one of defendant's executives, Joel Gibson, decided to keep plaintiff on the Blue Care Network (BCN) roll.

In September 1993, plaintiff asked Pat Stone, the human resources manager at BCN, how the leave of absence would "fall within the merger . . . ." Plaintiff testified that Stone talked to Gibson and then explained to plaintiff that because defendant "did not want to absorb the medical disability at that time . . . they wanted [her] to take the disability benefits through Blue Care Network and then once [she] was—six weeks after [she] had her child and returned to work [she] would be transferred to Blue Cross and Blue Shield . . . ." Plaintiff testified that had defendant transferred plaintiff to defendant's disability roster, she would have been entitled to resume the account representative position upon returning from LTD leave.

Additionally, despite having received repeated phone calls from plaintiff to check on the status of her BCBSM job,

3

Curdy, Whitford, and Roseberry neglected to return plaintiff's calls. Plaintiff managed to reach Roseberry by telephone on one occasion, but he told her not to worry and that he would keep her informed of the merger. He never did. Consequently, plaintiff's termination proceeded administratively and without notice to her. These intentional omissions supported plaintiff's position that the discriminatory animus earlier exhibited led to her dismissal.

Moreover, defendant's posttermination actions support the inference of a causal link between the discrimination alleged and defendant's employment actions. Specifically, defendant refused to rehire plaintiff to the account representative position upon her return, despite its custom of allowing an employee to resume his old position, if it remained available. When the account representative position became available after plaintiff's return, defendant refused to waive its new college degree requirement and consider plaintiff for the position. These posttermination facts support a jury inference that defendant's discriminatory animus caused it to exclude plaintiff from the account representative position after her disability leave.

II

The factual scenario presented in this case is scarcely so one-sided that a court could rule, as does the majority,

4

that defendant prevails *as a matter of law*.  Considering that plaintiff presented sufficient proof for the jury to infer a causal link between her pregnancy and defendant's failure to hire her, the jury's verdict should not be disturbed.  The jury was entitled to disbelieve that the LTD policy was the cause of her losing the job.  This Court should not supersede the jury's factual findings with its own evaluation of the facts; rather, it should affirm the Court of Appeals decision and allow the verdict to stand.

                    Marilyn Kelly