# STATE OF MICHIGAN

# COURT OF APPEALS

CRAIG HECHT,

        Plaintiff-Appellee,

UNPUBLISHED
October 28, 2014

v

NATIONAL HERITAGE ACADEMIES, INC.,

        Defendant-Appellant.

No. 306870
Genesee Circuit Court
LC No. 10-093161-CL

Before: SERVITTO, P.J., and CAVANAGH and WILDER, JJ.

PER CURIAM.

Defendant appeals as of right a judgment entered following a jury verdict in favor of plaintiff in this employment discrimination action. We affirm.

Defendant is a for-profit company that runs charter schools throughout the country. Plaintiff, a 35-year-old white male at the time of his firing, had been employed at a teacher in an at-will capacity with defendant since 2001. At the time of the incident giving rise to this litigation, plaintiff taught third grade at Linden Charter Academy ("LCA"), whose student body was approximately 93% African American.

On November 3, 2009, plaintiff was in his classroom with his students along with Floyd Bell, an African American special education paraprofessional assigned to plaintiff's classroom. At some point, Lisa Code, a white woman, who worked in the school library, entered the classroom to return a table she had borrowed. Realizing she had borrowed a brown table and was bringing a white table into the classroom, Code asked plaintiff if he cared whether he was getting a white table rather than the brown one she had actually borrowed. According to Code, plaintiff said he definitely liked the white table better than the brown and that all of the brown needed to go. Code thought that plaintiff was trying to be funny but was shocked because she knew how it sounded and thus asked plaintiff, "What?" Plaintiff indicated that he was joking with Bell at which point Code called "a big foul" on plaintiff.[1] Bell then called a foul "to the

---

[1] LCA employees created a "social contract" with each other, such that if an individual stated something that someone else found offensive or inappropriate, the person offended was to "call a foul" on the speaker. In response, the speaker was to give two "ups" to the person who called

highest power." Code immediately reported to Corinne Weaver, the dean of LCA,[2] a white woman, that plaintiff had said "[W]hite is better than brown anyway. Brown should burn." Code also reported to Weaver that plaintiff looked over his shoulder at a group of students and asked them, "White is better than brown, right?"

Bell also reported the incident to Weaver. As a result, Weaver asked plaintiff to come to her office to discuss the incident. Plaintiff explained that he had not meant any racist intent but merely meant his comments as a joke, like he had heard many times before at the school. Plaintiff asked to speak to Bell, who arrived at the office and the two shook hands.

Following her meeting with plaintiff, Weaver contacted the principal of LCA, Linda Caine-Smith, to advise her about the incident. As principal, Caine-Smith, a white woman, was the highest ranking position at LCA. The next morning, Caine-Smith spoke with plaintiff, Bell and Code and asked them all to prepare written statements about the incident. Caine-Smith also reported the incident to Courtney Unwin, the employee relation manager at defendant's office in Grand Rapids. Unwin reviewed the written statements and spoke to plaintiff by telephone. Noting that plaintiff's statement to her contradicted his written statement in some respects, Unwin informed plaintiff that an investigation of the incident would proceed and that his dismissal was an option. Plaintiff was thereafter placed on administrative leave. According to Bell, plaintiff approached him and pleaded with him to change his statement indicating that he had a wife and child. Bell advised plaintiff that he would not lie. Plaintiff also left two phone messages for Code, but she did not return his calls.

Bell reported his encounter with plaintiff to Caine-Smith and prepared a written statement concerning the same. Caine-Smith also learned that plaintiff had attempted to contact Code and believed he was attempting to interfere with their investigation. She thus called Unwin to discuss this concern. Following their discussion, Caine-Smith and Unwin decided to terminate plaintiff's employment for the stated reasons that: (1) plaintiff made an inappropriate racial statement in front of students; and, (2) plaintiff interfered with their investigation of the incident.

Plaintiff filed a complaint against defendant, alleging racial discrimination in violation of the Elliott-Larsen Civil Rights Act, MCL 37.2201 *et seq*. Plaintiff alleged that race was a substantial factor in defendant's decision to terminate plaintiff's employment and that he was treated less favorably than similarly situated African-American employees. The jury agreed, rendering a verdict in his favor in the amount of $535,120.00.

On appeal, defendant first contends that there was insufficient evidence to support the jury's verdict that racial discrimination was a factor in plaintiff's termination such that the trial court erred in denying its motion for JNOV. We disagree.

This Court reviews a trial court's decision on a motion for JNOV de novo. *Sniecinski v Blue Cross and Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). We review

---

the foul, which are positive statements about the person. In this instance, Plaintiff testified that he did not give any "ups" to either Bell or Code because he did not hear any foul called.

[2] The dean is the second highest position at LCA.

the evidence and all legitimate inferences in the light most favorable to the nonmoving party, recognizing that a motion for JNOV should be granted only if the evidence viewed in this light fails to establish a claim as a matter of law. *Id*.

MCL 37.2202 provides, in pertinent part, as follows:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v Sanderson Plumbing Products, Inc*, 530 US 133, 153; 120 S Ct 2097; 147 L Ed 2d 105 (2000). Proof of discriminatory treatment may be established by direct evidence or by indirect or circumstantial evidence. *Sniecinski*, 469 Mich at 132. In *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001), our Supreme Court cited with approval the United States Court of Appeals for the Sixth Circuit's definition of "direct evidence" as "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id*., quoting *Jacklyn v Schering Plough Healthcare Products Sales Corp*, 176 F3d 921, 926 (CA 6, 1999).

In this matter, the crux of plaintiff's assertion that he was subject to disparate treatment was that "racial bantering" occurred in the school on many occasions but that the others who engaged in racial bantering were not punished because they were African-American. Plaintiff asserted that the incident that he was involved in also constituted racial bantering, but that he was discharged because he was white.

The only direct evidence of discrimination was a statement attributed to Caine-Smith, one of the decision-makers who ultimately decided to discharge plaintiff. When relating the incident in plaintiff's classroom to Caine-Smith, Weaver testified that Caine-Smith also indicated to her that she had heard racial bantering at the school before:

> *[Plaintiff's Counsel]*: Did you bring that information to her attention?
>
> *Weaver*: I think I told her that, you know, those things do happen around here, but they were under different circumstances.
>
> *[Plaintiff's Counsel]*: How did she respond when you said, "those things do happen around here?"?
>
> Weaver: I—I think her point was that it happens amongst African Americans. And it's not the other way around. And this wh—and that this one was reported, someone was offended, and we had an obligation to follow up on it.

There need be no inference drawn to understand that Caine-Smith's response was an acknowledgement that while racial bantering among African Americans occurred, it did not occur between a white person such as plaintiff and an African American, and in firing plaintiff for such bantering one could conclude that Caine-Smith was motivated at least in part by plaintiff's race. In other words, if Weaver's interpretation is believed by the trier of fact, it would demonstrate that plaintiff's race was at least a motivating factor in the employer's actions because if he were a black person saying that same comment to another black person, then he would not have been punished. Caine-Smith stating to Weaver that the situation was distinguishable because the incident was reported and someone was offended certainly is important, but it does not negate her previous statement.

It is true that Weaver's testimony constitutes a summation of what Caine-Smith may have meant rather than a statement of what Caine-Smith actually said. As such, it could reasonably be subject to differing interpretations. For example, the statement or point attributed to Caine-Smith could be interpreted to mean that because plaintiff was white, his racially based comments could not be tolerated in the same way that comments made by African Americans could be, or that she felt pressure to impose a stricter punishment on plaintiff for his comments because he was white. An equally plausible interpretation could be that Caine-Smith was searching for an explanation or rationalization as to why no one had previously complained to the administration about racial bantering at the school and found one in the fact that prior bantering had occurred only between African Americans and not between a white person such as plaintiff and an African American such as Bell or between only white persons such as plaintiff and Code. In either event, however, plaintiff's race was clearly part of the equation. And, that the statements could be subject to differing interpretations supports upholding the jury's verdict.

In *DeBrow v Century 21 Great Lakes, Inc (After Remand)*, 463 Mich 534, 540; 620 NW2d 836 (2001), our Supreme Court held that a single remark in the context of a discussion regarding an employee's termination, and the remark's weight and believability are matters for the fact-finder to determine. In that case, after the plaintiff was fired from his job, he sued his former employer, alleging age discrimination. The trial court granted summary disposition in favor of the employer and a panel of this Court twice affirmed. Our Supreme Court reversed, holding that the singular statement to the plaintiff by his supervisor that he was "getting too old for this shit" constituted direct evidence of age discrimination. *Id*. at 538. Relevant to the instant matter, the *DeBrow* Court stated:

> We recognize that this remark may be subject to varying interpretations. It might reasonably be taken as merely an expression of sympathy that does not encompass a statement that the plaintiff's age was a motivating factor in removing him from his position as an executive. However, it is well established that, in reviewing a decision on a motion for summary disposition under MCR 2.116(C)(10), we must consider the documentary evidence presented to the trial court in the light most favorable to the nonmoving party. *Id*. at 538-539.

The Supreme Court concluded, "While a factfinder might be convinced by other evidence regarding the circumstances of the plaintiff's removal that it was not motivated in any part by the plaintiff's age and that the facially incriminating remark was no more than an expression of sympathy, such weighing of evidence is for the factfinder . . . ." *Id*. at 539.

While this matter involves a motion for JNOV rather than a motion for summary disposition, the standard of review for both motions is the same and it is the standard of review that we must apply that is the crucial factor in resolving this matter. Again, reversal is permitted when reviewing the denial of a motion for JNOV only if the evidence, while viewed in a light most favorable to the plaintiff, fails to establish a claim as a matter of law. *Sniecinski*, 469 Mich at 131. When reasonable jurors could honestly reach different conclusions regarding the evidence, the jury verdict must stand. *Zantel Marketing Agency v Whitesell Corp*, 265 Mich App 559, 568; 696 NW2d 735 (2005).

Consistent with *DeBrow*, even if Weaver's recollection of Caine-Smith's alleged statement was subject to differing interpretations, it was properly up to the jury to determine which interpretation fit Caine-Smith's intention. We must view the evidence in the light most favorable to the non-moving party upon review and it is not irrational to conclude that the jury made a determination of Caine-Smith's statement that was unfavorable to defendant's position. Such a determination was within the jury's realm just as it was within the jury's realm to weigh and consider *all* of Caine-Smith's remarks and ultimately decide if plaintiff's race was a factor in defendant's decision to terminate plaintiff's employment.

While defendant additionally argues that plaintiff presented insufficient circumstantial evidence to survive the burden-shifting approach set forth in *McDonnell Douglas v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 888 (1973), the burden-shifting approach is inapplicable not only where direct evidence is offered, as it was here, but simply in general once the matter has proceeded to trial and is passed to the jury. "Where direct evidence is offered to prove discrimination, a plaintiff is not required to establish a prima facie case within the *McDonnell Douglas* framework, and the case should proceed as an ordinary civil matter." *DeBrow*, 463 Mich at 539-540 (quotations omitted). More importantly, as our Supreme Court explained in *Hazle*, 464 Mich at 466-467, quoting *Texas Dep't of Community Affairs v Burdine*, 450 US 248, 256 n 8; 101 S Ct 1089; 67 L Ed 2d 207 (1981):

> [t]he *McDonnell Douglas* burden-shifting framework is merely intended 'to progressively sharpen the inquiry into the elusive factual question of intentional discrimination.' It is important to keep in mind, therefore, that for purposes of claims brought under the Michigan Civil Rights Act, the *McDonnell Douglas* approach merely provides a mechanism for assessing motions for summary disposition and directed verdict in cases involving circumstantial evidence of discrimination. It is useful only for purposes of assisting trial courts in determining whether there is a jury-submissible issue on the ultimate fact question of unlawful discrimination. The *McDonnell Douglas* model is *not* relevant to a jury's evaluation of evidence at trial . . . . See *Gehring v Case Corp*, 43 F 3d 340, 343 (CA 7, 1995) (explaining that, in federal discrimination cases, "[o]nce the judge finds that the plaintiff has made the minimum necessary demonstration [the 'prima facie case'] and that the defendant has produced an age-neutral explanation, the burden-shifting apparatus has served its purpose, and the only remaining question-the *only* question the jury need answer-is whether the plaintiff is a victim of intentional discrimination").

The *McDonnell Douglas* framework approach "was adopted because many plaintiffs in employment-discrimination cases can cite no direct evidence of unlawful discrimination. The courts therefore allow a plaintiff to present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful discrimination." *DeBrow*, 463 Mich at 537-538 (emphasis in original).

As the Sixth Circuit Court of Appeals explained, there was no jury in *McDonnell Douglas* and " 'The critical issue,' as the Supreme Court explained, 'concerns *the order and allocation of proof* in a private, non-class-action challenging employment discrimination.' [*McDonnell Douglas*, 411 US at 800]. The 'order and allocation of proof' are not matters for which juries are responsible." *Brown v Packaging Corp of America*, 338 F3d 586, 591 (CA 6 (2003) (emphasis in original). Thus, the *McDonnell Douglas* analysis is used only when plaintiff's establishment of a prima facie case is at issue. Once a jury submissible issue on the ultimate fact of whether there has been unlawful discrimination has been found-i.e., once summary disposition and directed verdict motions have been resolved, the need for the analysis has passed. In the instant matter, no summary disposition decision is at issue, nor is the defendant's directed verdict motion being appealed.

Plaintiff's claim was for disparate treatment. Thus, had he not provided direct evidence of discrimination, in order to defeat defendant's motion for JNOV, he must have provided sufficient circumstantial evidence that: (1) he was a member of a protected class; (2) that an adverse employment action was taken against him; (3) that he was qualified for the position; and, (4) that others, similarly situated and outside the protected class were unaffected by the employer's adverse conduct. See, e.g., *Town v Michigan Bell Telephone Co*, 455 Mich 688, 695; 568 NW2d 64 (1997). So long as the jury found some type of evidence of intentional discrimination-direct *or* circumstantial-its verdict must be upheld.

There is no dispute that plaintiff, a white male, was a qualified teacher who suffered an adverse employment action. At trial, evidence was provided concerning several instances of racial "banter" (which plaintiff claims his comments constituted) wherein those engaging in the same were not punished. On a professional development day, plaintiff was with several other people, when one of them, an African American man, made a statement about a Dora the Explorer mural on the wall. The employee stated that because the paint on Dora's skin was so dark, she should be called "Laquisha" instead. Bell was present during this incident. On another professional development day, some staff members were on a bus when Weaver was asked in casual conversation what she was doing for dinner that night. When she responded that she was making pork chops, an African American staff member replied, "Why would you be making pork chops; you're white?" Plaintiff was one of approximately 25 staff members on the bus when this incident occurred. According to Weaver, on another occasion, an African American staff member told her she should not eat soul food because she was white. Plaintiff testified to an incident where he saw the school secretary, who is African American, call to one of the students, saying "[H]ey, come here light skinned." When Code was working as a secretary at the school, an African American staff member had told her she could not do something because she was white. Though she felt the comment was inappropriate, Code testified that she did not report the incident. Weaver also testified to hearing the "n" word used several times at LCA by African American staff members and that she had heard African American staff members engage in racial bantering up to 20 times.

-6-

It is undisputed that no African American staff member was ever disciplined in any manner for racial bantering, even though the dean was the target of such bantering on several occasions. It is true that plaintiff's remarks appear to be the only ones that generated a complaint that was forwarded to the principal. However, Unwin, defendant's employee relations manager (and the second party involved in the decision to terminate plaintiff) testified that Weaver had an obligation to report all serious racial remarks, including the use of the "n" word, even if it was spoken by an African American individual and it was incorrect for her to have failed to do so. Plaintiff was the only person at LCA to ever be disciplined for making a racial remark.

The above constitutes sufficient circumstantial evidence that plaintiff was similarly situated to African American employees who had made racial remarks at school and to other employees who were not punished. The trial court thus properly denied defendant's motion for JNOV.

Defendant next contends that disclosures concerning plaintiff's unprofessional conduct that it made in response to requests by prospective employers of plaintiff should not have been admitted into evidence. According to defendant, the disclosures were mandatory pursuant to MCL 380.1230b and the trial court erred in admitting them into evidence because the evidence was irrelevant. We disagree.

We review preserved evidentiary issues for an abuse of discretion. *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008). An abuse of discretion occurs when the trial court chooses an outcome that falls "outside the range of principled outcomes." *Id*.

In general, relevant evidence is admissible and irrelevant evidence is not admissible. MRE 402. Relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. *County of Wayne v Michigan State Tax Com'n*, 261 Mich App 174, 196; 682 NW2d 100 (2004).

The disclosures at issue were required under MCL 380.1230b, which provides in relevant part:

(1) Before hiring an applicant for employment, a school district, local act school district, public school academy, intermediate school district, or nonpublic school shall request the applicant for employment to sign a statement that does both of the following:

(a) Authorizes the applicant's current or former employer or employers to disclose to the school district, local act school district, public school academy, intermediate school district, or nonpublic school any unprofessional conduct by the applicant and to make available to the school district, local act school district, public school academy, intermediate school district, or nonpublic school copies of all documents in the employee's personnel record maintained by the current or former employer relating to that unprofessional conduct.

(b) Releases the current or former employer, and employees acting on behalf of the current or former employer, from any liability for providing information

-7-

described in subdivision (a), as provided in subsection (3), and waives any written notice required under section 6 of the Bullard-Plawecki employee right to know act, Act No. 397 of the Public Acts of 1978, being section 423.506 of the Michigan Compiled Laws.

(2) Before hiring an applicant for employment, a school district, local act school district, public school academy, intermediate school district, or nonpublic school shall request at least the applicant's current employer or, if the applicant is not currently employed, the applicant's immediately previous employer to provide the information described in subsection (1)(a), if any. The request shall include a copy of the statement signed by the applicant under subsection (1).

(3) Not later than 20 business days after receiving a request under subsection (2), an employer shall provide the information requested and make available to the requesting school district, local act school district, public school academy, intermediate school district, or nonpublic school copies of all documents in the employee's personnel record relating to the unprofessional conduct. An employer, or an employee acting on behalf of the employer, that discloses information under this section in good faith is immune from civil liability for the disclosure . . . .

Though defendant maintains that the disclosures should not have been admitted into evidence because subsection (3) provides for immunity from civil liability, such immunity applies only "for the disclosure" itself. In other words, a defendant cannot be sued for making a good-faith disclosure under the statute. The statute does not, however, create a privilege whereby evidence of the disclosure is inadmissible under all circumstances. Plaintiff in this case did not sue defendant for the disclosure but instead sued defendant for racial discrimination on the basis of his termination. The fact that the disclosures may be relevant in the discrimination lawsuit does not implicate the immunity granted by statute.

A plaintiff bringing a civil rights action may bring such an action for "damages," which is defined as "damages for injury or loss caused by each violation" of the Elliott-Larsen Civil Rights Act, MCL 37.2810 *et seq*. MCL 37.2801(3). A plaintiff bears the initial burden of proving his or her damages, but once that burden has been met, the respondent bears the burden of demonstrating that the claimant failed to mitigate his or her damages. *Department of Civil Rights v Horizon Tube Fabricating, Inc*, 148 Mich App 633, 638; 385 NW2d 685 (1986). The respondent must do so by establishing "(1) that the damage suffered by plaintiff could have been avoided, *i.e.,* that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." *Id*., quoting *Sias v City Demonstration Agency*, 588 F2d 692, 696 (CA 9, 1978). In this matter, plaintiff had the burden of proving his damages and, anticipating that defendant would claim that he failed to mitigate his damages, could reasonably address any such argument by showing that he attempted to obtain other teaching jobs but was unable to do so due to the disclosures and instead took a job outside of the area of teaching that paid considerably less than his teaching position with defendant. The evidence was thus relevant and the trial court did not abuse its discretion in admitting the evidence.

Defendant also argues that even if relevant, the evidence should have been excluded under MRE 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Defendant did not raise this argument before the trial court. We thus review this unpreserved evidentiary issue to determine whether there was plain error affecting defendant's substantial rights. See, e.g., *Hilgendorf v St. John Hosp and Medical Center Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001).

"Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785, 796 (1998). The probative value of the disclosures was not merely marginally probative, given that it helped explain why plaintiff failed to obtain another teaching job after he was fired. Additionally, it was not clear that the jury would have given this evidence undue weight because the jury was instructed that defendant was required by law to provide the disclosures. Defendant has thus failed to establish any plain error affecting its substantial rights in the admission of the challenged evidence.

Defendant's final argument on appeal is that the jury's award of future economic damages or "front pay" was excessive and unsupported by the evidence such that it was entitled to a new trial or remittitur premised upon this award. We disagree.

We review a trial court's decision on a motion for new trial or remittitur for an abuse of discretion. *Shaw v Ecorse*, 283 Mich App 1, 17-18; 770 NW2d 31(2009). In conducting our review, we view all of the evidence in the light most favorable to the nonmoving party. *Id*. at 18.

"In determining whether remittitur is appropriate, a trial court must decide whether the jury award was supported by the evidence. This determination must be based on objective criteria relating to the actual conduct of the trial or the evidence presented." *Silberstein v Pro–Golf of America, Inc*, 278 Mich App 446, 462; 750 NW2d 615 (2008) (citation omitted). Our Supreme Court has indicated that the objective factors that should be considered by this Court are:

> (1) whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; (2) whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; and (3) whether the amount actually awarded is comparable with awards in similar cases both within the state and in other jurisdictions. [*Freed v Salas*, 286 Mich App 300, 334; 780 NW2d 844 (2009) (citation omitted).]

If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, the jury award should not be disturbed. *Frohman v Detroit*, 181 Mich App 400, 415; 450 NW2d 59 (1989).

While defendant first contends that the existence of *any* front pay is too speculative, that does not preclude an award of damages. Rather, "[i]n deciding whether to award such damages the courts should look to (1) whether reinstatement would be a feasible remedy, (2) the employee's prospects for other employment, and (3) the number of years remaining before the

employee would be faced with mandatory retirement." *Riethmiller v Blue Cross and Blue Shield of Michigan*, 151 Mich App 188, 200-201; 390 NW2d 227 (1986). Moreover, "[t]he fact that such damages may be speculative should not exonerate a wrongdoer from liability. *Id*. at 201-202.

In this matter, it was clear that reinstatement was not a feasible remedy. The evidence also made clear that it was highly unlikely that plaintiff would ever be able to obtain another teaching position. As previously indicated, for every such potential employment opportunity, defendant was obligated to provide the disclosures to plaintiff's potential employers. MCL 380.1230b. Considering that plaintiff had been consistently told that his services were no longer needed once his employer had received the disclosures, the jury could reasonably infer that the pattern would continue. And, the evidence indicated that plaintiff, a relatively young man, had a bachelor's degree in elementary education and a master's degree in educational leadership, indicating that his education and qualifications appear to be primarily (if not solely) in the field of education.

Defendant maintains that the fact that plaintiff cannot obtain employment as a teacher due to the statutorily required disclosures means that his "injury" is not compensable. However, the salient point is that the jury found that defendant had wrongfully discriminated against plaintiff when it fired him. Thus, plaintiff was entitled to recover for any loss caused by the violation in order to make him "whole." See MCL 37.2801(3). Plaintiff was making $51,000 per year in defendant's employ and, as a result of defendant's wrongful conduct, was unable to continue making this income. As a result of the disclosures, brought about by defendant's discriminatory conduct, he was unable to obtain another teaching position that may have paid a similar amount. Instead, he was only able to secure employment outside of his field making approximately $29,000 per year. The jury could reasonably award plaintiff the shortfall he was expected to encounter going forward.

Further, it was not too speculative to presume that plaintiff would have continued to teach as an employee of defendant for many years. The record reveals that plaintiff was passionate about teaching and had favorable reviews as a teacher with defendant. Plaintiff was 35 years old and had worked for defendant for eight years when he was fired. Consequently, the verdict awarding plaintiff future damages in the amount of $485,000 ($22,000 shortfall multiplied by 22 years) was supported by the evidence. Viewing the evidence in a light most favorable to plaintiff, the award fell within the range of the evidence and within the limits of what reasonable minds would deem just compensation. *Frohman*, 181 Mich App at 415. The particular circumstances in this case show that the trial court did not abuse its discretion in denying defendant's motion for a new trial or remittitur.

Affirmed.


/s/ Deborah A. Servitto
/s/ Mark J. Cavanagh