# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL LUCERO,

Plaintiff-Appellant,

v

DEPARTMENT OF CORRECTIONS,

Defendant-Appellee.

UNPUBLISHED
March 12, 2015

No. 319211
Court of Claims
LC No. 13-000013-MZ

Before: JANSEN, P.J., and METER and BECKERING, JJ.

PER CURIAM.

Plaintiff, Michael Lucero, appeals by right the decision of the Court of Claims granting summary disposition in favor of defendant, the Department of Corrections, under MCR 2.116(C)(7) (governmental immunity) and (C)(10) (no genuine issue of material fact), and dismissing his retaliatory discharge claim under the Worker's Disability Compensation Act of 1969 (WDCA), MCL 418.101 *et seq*. Because we find that there was no genuine issue of material fact with regard to his retaliatory discharge claim, we affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff worked for defendant as a resident unit officer, a position that required contact with inmates. On March 2, 2011 plaintiff assisted other correction officers with an inmate who was assaulting another officer. As the officers were securing and moving the inmate, plaintiff made contact with two doorjambs; after the second occurrence, his right arm went limp. Medical staff examined plaintiff and placed him on leave.

On approximately April 13, 2011, Citizens' Management, defendant's worker's compensation insurance carrier, sent plaintiff to Dr. Michael Sperl for an independent medical examination. Dr. Sperl concluded that plaintiff could return to work with restrictions, including avoiding "any type of altercation and/or direct force to the right shoulder region," as well as avoiding "any type of inmate altercation and/or direct force beyond 15-20 pounds" to the right shoulder. Dr. Sperl's report continued:

> If restrictions were afforded to [plaintiff], he could certainly work in a limited inmate contact situation as I understand entailing working in the presence of an inmate, but not supervising and/or restraining of inmates. Such employment, if available, would be feasible.

-1-

Defendant subsequently approved the accommodation of plaintiff's restrictions and sent notice to plaintiff that work within Dr. Sperl's restrictions was available, and that he should return to work on April 30, 2011.

On April 30, 2011, plaintiff reported to work in the inmate visitation room and defendant attempted to impose the restrictions imposed by Dr. Sperl. After a few hours, plaintiff left without reporting his absence because, in his words, the pain became "unbearable" and he "couldn't stand it anymore." According to plaintiff, the position offered "didn't match" the restrictions imposed by Dr. Sperl because, in his opinion, being in the inmate visitation room did not involve limited inmate interaction. However, he testified that defendant had specifically placed him in the position because it had attempted to accommodate his restrictions.

In early May of 2011, defendant ordered plaintiff to report to work immediately or provide adequate documentation to justify his absence; defendant gave plaintiff until May 16, 2011, to comply. In a letter, defendant stated that failure to comply would result in plaintiff being separated from his employment for unauthorized absences. Defendant informed plaintiff that he had been absent from work without authorization since April 30, 2011.

In response, plaintiff provided a disability slip from Dr. Paul LaClair, his personal physician, stating that he had work restrictions caused by his injury including: (1) no inmate contact; and (2) no pushing, pulling, or lifting with his right arm. Plaintiff admitted receiving a letter from defendant indicating that if plaintiff wanted defendant to implement work restrictions, those restrictions had to come from Dr. Sperl, the independent medical examiner. Michelle Foco, a human resources representative at plaintiff's facility, testified in her deposition that generally, if an employee stated that he or she could not handle work with restrictions imposed by an independent medical examination, the employee was supposed to attempt to resolve the matter with the worker's compensation carrier and the independent medical examiner.

In addition to providing the disability slip, plaintiff returned to work, with restrictions, on May 16, 2011. Kimberly Johnson, a human resources analyst employed by defendant, testified in her deposition that the facility attempted to accommodate the restrictions imposed by both Dr. Sperl and Dr. LaClair. However, as he had done before, plaintiff only worked a few hours before leaving because he was in pain. Plaintiff acknowledged in a deposition that defendant accommodated his restrictions, but he believed that his pain made it too difficult for him to work, even with the restrictions.

On or about June 9, 2011, defendant sent a letter informing plaintiff that he had been absent from work without authorization since May 17, 2011. The letter stated that plaintiff "must immediately report to work or contact our office and provide adequate documentation to justify [his] absence from work." The letter stated that plaintiff's failure to do so would result in his termination from employment for unauthorized absence.

Instead of returning to work, plaintiff provided defendant with a note from Dr. LaClair stating that he should be off from work from June 13 until July 21, 2011. A subsequent note stated that Dr. LaClair was unable to predict a date on which plaintiff could return to work and that plaintiff could not work due to a "C5-6 disc herniation." On June 14, 2011, plaintiff's

attorney advised defendant that plaintiff filed an application for hearing with the Bureau of Worker's Compensation.

On July 1, 2011, Johnson sent plaintiff a letter stating that his leave time under the Family and Medical Leave Act (FMLA), 28 USC 2601 *et seq.*, had been exhausted, and that future approval for leave under FMLA, which was available, was "contingent on clarification of your medical condition from Dr. Paul LaClair." The letter stated that failure to provide certain, enumerated information would lead to plaintiff's separation from employment. That information included: (1) a medical diagnosis of the condition that prevented plaintiff from working; (2) the work restrictions, if any, that Dr. LaClair would provide for plaintiff's diagnosis; (3) the beginning and end dates of plaintiff's restrictions, as approved by Dr. LaClair; (4) the date plaintiff was expected to return to full duty; and (5) an expected recovery date.

On July 12, 2011, defendant sent a letter to plaintiff informing him that he used more than six months of unpaid leave within a five-year period, which was the maximum allowed under defendant's policies and plaintiff's employment agreement. The letter also stated that plaintiff's FMLA time was exhausted, and that plaintiff would be terminated for "unauthorized absence" if he did not request a medical leave of absence extension or begin a "waived rights leave of absence." The letter explained how plaintiff could begin the process of requesting a medical leave of absence extension and how he could initiate a waived rights leave of absence. Further, the letter stated that plaintiff could return to work, but prior to doing so, needed to provide a "fitness for duty certification" and that any work restrictions "must be approved" by defendant before plaintiff could be returned to his position.

On or about July 20, 2011, plaintiff underwent a second examination with Dr. Sperl, who ordered working restrictions of avoiding direct inmate contact, repetitive neck rotation and/or extension activities, and lifting weights greater than 10 to 15 pounds with his right arm. Before making this recommendation, Dr. Sperl reviewed and noted Dr. LaClair's opinion regarding the disc bulge.

In addition to Dr. Sperl's second report, plaintiff submitted to defendant a note from Dr. LaClair on July 25, 2011, stating that plaintiff's work restrictions included "limited inmate contact & no possibility of any type of altercation." The restrictions also stated that if plaintiff returned to work, "he would need to avoid direct inmate contact, in essence, a light duty job . . .." According to Johnson, the communication from Dr. LaClair was not sufficient to satisfy the questions asked in the July 1, 2011 letter.

In a July 25, 2011 e-mail, Johnson asked if Foco could accommodate the following restrictions for plaintiff: (1) no lifting more than 10 pounds; (2) "limited inmate contact;" and (3) "office work only." Foco responded with the following e-mail:

> I spoke with the Warden who said that we will NOT accommodate these restrictions. We do not have "office work only" available for [a resident unit officer] and we have attempted to accommodate similar restrictions in the past (ie: limited inmate contact) and [plaintiff] could not withstand them. The Warden is not inclined to accommodate any restrictions for [plaintiff] at this point.

By plaintiff's own admission in his deposition, there was always the possibility of inmate interactions while working with an inmate population. He admitted there was no position that would guarantee that he would not have an interaction or altercation with an inmate.

On July 26, 2011, plaintiff wrote to Johnson, indicating that he was "waiting for my doctor to get back into his office" so that he could "get a fitness for duty slip that should satisfy the needs of the employer and return me to work." Plaintiff also asked for reasons why his previous request for work, with restrictions imposed by doctors was denied. It is unclear if plaintiff received any response to his request.

In an unrelated e-mail, which was not sent to plaintiff, Foco confirmed that defendant was not comfortable with plaintiff returning to work "because we had given [plaintiff] the opportunity to return with [the same] restrictions several times, but each time he chose not to work." In addition, the e-mail stated that Foco asked plaintiff to fax a set of work restrictions to defendant. In her deposition, Foco stated that the July 25, 2011 restrictions suggested by Dr. LaClair, which included no possibility of inmate altercation, were restrictions, "we couldn't accommodate." She explained that plaintiff's case, as with all cases for accommodations, was reviewed by the warden of the correctional facility, and that the warden determined the facility could not accommodate plaintiff's request.

Thereafter, defendant issued plaintiff a letter terminating his employment for being absent for more than six months during a five-year period, as this was a breach of plaintiff's union contract and defendant's policies. The termination was effective August 1, 2011. According to plaintiff's deposition testimony, defendant, in a separate, subsequent action for worker's compensation benefits, settled a worker's compensation claim and agreed to pay benefits.

Plaintiff initiated the instant action in September 2012, alleging retaliation for filing a worker's compensation claim, and defendant moved for summary disposition arguing governmental immunity under MCR 2.116(C)(7) and that there was no genuine issue of material fact under MCR 2.116(C)(10). The trial court granted defendant's motion on both grounds.

## II. SUMMARY DISPOSITION UNDER MCR 2.116(C)(7)

As an initial matter, we briefly address, and reject, the conclusion that defendant was entitled to summary disposition under MCR 2.116(C)(7) on the basis of governmental immunity. We review de novo the grant or denial of summary disposition under MCR 2.116(C)(7) on grounds of governmental immunity. *Roby v Mount Clemens*, 274 Mich App 26, 28; 731 NW2d 494 (2007).

The Governmental Tort Liability Act (GTLA), provides that "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1). Exceptions to governmental immunity are to be narrowly construed. *Maskery v Univ of Mich Bd of Regents*, 468 Mich 609, 614; 664 NW2d 165 (2003).

In this case, there is no dispute that defendant is a government agency, see MCL 691.1401(a), (g), or that, in hiring and firing an employee, defendant was engaged in the exercise

of a governmental function.  See MCL 800.324(1)(e) (explaining that the department of corrections is empowered to ("[r]ecruit and employ agents and assistants through the department of civil service as may be necessary to carry out the purposes of this act and recommend to the department of civil service classes and selection procedures that recognize the unique needs of correctional industries in this state.").  There is also no dispute that plaintiff's claim sounds in tort.  See *Phillips v Butterball Farms Co, Inc*, 448 Mich 239, 248-249; 531 NW2d 144 (1995).

The question then becomes whether an exception to governmental immunity applies that would permit plaintiff's suit.  A claim for retaliatory discharge under the WDCA is not within the enumerated exceptions found in the GTLA.  See *In re Bradley Estate*, 494 Mich 367, 378 n 21; 835 NW2d 545 (2013) (listing the statutory exceptions contained in the GTLA).  However, there are "areas outside the GTLA where the Legislature has allowed specific actions against the government to stand, such as the Civil Rights Act." *Mack v Detroit*, 467 Mich 186, 195; 649 NW2d 47 (2002).  See also *Lash v Traverse City*, 479 Mich 180, 195; 735 NW2d 628 (2007) (recognizing instances where the Legislature, by specifically applying an act to the state or its political subdivisions, has created causes of action against the state or its political subdivisions). We agree with plaintiff that this is one of those areas.

Under the WDCA, a

person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.  [MCL 418.301(13).]

The WDCA makes clear that this prohibition against retaliatory discrimination applies to *all* employers.  MCL 418.111 expressly provides that "[e]very employer, *public and private . . .* shall be subject to the provisions of this act and shall be bound thereby."  (Emphasis added). Further, MCL 418.151(a) expressly includes the state and its political subdivisions in the list of those who are subject to the WDCA:

The following constitutes employers subject to this act:

(a) The state; each county, city, township, incorporated village, and school district; each incorporated public board or public commission in this state authorized by law to hold property and to sue or be sued generally; and any library in a county with a population less than 600,000 . . . if the library board by resolution expresses its intention to be considered as a separate employer from the county where it is located for purposes of this act.

Moreover, the act provides that an employer subject to the act includes "[e]very person[.]"  MCL 418.151(b).

The preceding sections of the WDCA make it apparent that the state and political subdivisions thereof are subject to the act and that they shall be bound by its provisions.  One of those provisions, MCL 418.301(13), prohibits retaliatory discharge against employees who exercise rights under the WDCA.  Accordingly, a person who is an employer, including the state

and its political subdivisions, is governed by the prohibition in MCL 418.301(13). Where the state and its political subdivisions are expressly named in the WDCA as persons to whom the act applies, we find that defendant was not entitled to governmental immunity on plaintiff's retaliatory discharge claim. See *Manning v City of Hazel Park*, 202 Mich App 685, 699; 509 NW2d 874 (1993) (finding that a governmental immunity defense did not apply to discrimination claims under the Civil Rights Act because the statute expressly included state and political subdivisions as employers covered by the act). See also *Anzaldua v Band*, 457 Mich 530, 552; 578 NW2d 306 (1998) (declining to find immunity for the state under the Whistleblowers' Protection Act "[b]ecause the state is expressly named in the act . . . .").

Nevertheless, while we find that the suit was not barred by governmental immunity, as discussed *infra*, we affirm the result reached by the trial court because we agree that defendant was entitled to summary disposition pursuant to MCR 2.116(C)(10).

## III. SUMMARY DISPOSITION UNDER MCR 2.116(C)(10)

MCR 2.116(C)(10) provides that where, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, . . . the moving party is entitled to judgment or partial judgment as a matter of law." A (C)(10) motion tests the factual sufficiency of the complaint, and in entertaining the motion, the court considers the affidavits, pleadings, depositions, admissions, and other evidence in the light most favorable to the party opposing the motion. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). If the proffered evidence "fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law." *Id*.

> The moving party must specifically identify the matters that have no disputed factual issues, and it has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. The party opposing the motion then has the burden of showing by evidentiary materials that a genuine issue of disputed material fact exists. [*Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440-441; 814 NW2d 670 (2012) (internal citations omitted).]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ." *Id.* at 441.

Plaintiff alleged retaliatory discharge under the WDCA. In particular, he claimed that defendant terminated his employment in retaliation for claiming benefits under the WDCA and for requesting a hearing under the act. MCL 418.301(13) provides that

> [a] person shall not discharge an employee or in any manner discriminate against an employee because the employee filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by this act.

This Court established the four elements necessary to make a prima facie case of retaliatory discharge in *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 275; 826 NW2d 519 (2012):

> (1) that the employee asserted a right to obtain necessary medical services or actually exercised that right, (2) that the employer knew that the employee engaged in this protected conduct, (3) that the employer took an employment action adverse to the employee, and (4) that the adverse employment action and the employee's assertion or exercise of a right afforded under MCL 418.315(1) were causally connected.

The first three elements are not contested. Whether summary disposition was properly granted turns on the fourth element: that the adverse employment action was causally connected to plaintiff's assertion of a right under the WDCA.

Generally, causation is the most difficult element to prove. See *id.* In a case, such as this one, where the plaintiff relies on circumstantial evidence of an employer's alleged retaliatory motivation, we examine the claim under the *McDonnell Douglas/Burdine*[1] burden-shifting framework. *Id.* at 276. Under the *McDonnell Douglas/Burdine* burden-shifting approach,

> when a plaintiff asserting a claim for retaliatory discharge under MCL 418.301(13) circumstantially establishes a rebuttable prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for its adverse employment action. If the defendant produces a legitimate, nondiscriminatory reason for its action, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that [retaliation] was a motivating factor for the adverse action taken by the employer toward the plaintiff. A plaintiff can establish that the employer's proffered reasons for the adverse employment action qualify as pretextual by demonstrating that the reasons (1) had no basis in fact, (2) were not the actual factors motivating the decision, or (3) were insufficient to justify the decision. [*Id.* at 276-277 (citations and quotation marks omitted).]

As an initial matter, "[t]he burden is on plaintiff to show that there was a causal connection between the protected activity, i.e., the filing of his worker's compensation claim, and the adverse employment action." *Chiles v Machine Shop, Inc*, 238 Mich App 462, 470; 606 NW2d 398 (1999). "Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *West v Gen Motors Corp*, 469 Mich 177, 186; 665 NW2d 468 (2003). In addition, "[m]ere speculation or conjecture is insufficient to establish reasonable inferences of

---

[1] *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973); *Texas Dep't of Community Affairs v Burdine*, 450 US 248; 101 S Ct 1089; 67 L Ed 2d 207 (1981).

causation." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 140; 666 NW2d 186 (2003).

Here, plaintiff cannot make the requisite showing of a causal connection between the protected activity—seeking worker's compensation benefits and requesting a hearing—and his termination. Dr. Sperl opined that plaintiff could return to work and provided restrictions for plaintiff's work. Defendant attempted to comply with those restrictions, and, on two occasions, plaintiff ceased working after only a few hours. Defendant, over the course of several months, informed plaintiff that he needed to either work, or provide proper documentation to excuse his absence from work. Plaintiff did not return to work. Nor did he provide documentation to excuse his absence, as Dr. Sperl opined that plaintiff could work, with the same restrictions under which plaintiff had refused to work. Plaintiff's own doctor, Dr. LaClair, concluded that plaintiff could work with restrictions. It was only after plaintiff failed to either return to work or provide adequate documentation to excuse his absence that defendant, in May of 2011, began to inform plaintiff that his employment could be terminated. Defendant continued to provide plaintiff with more time and more opportunities to avoid termination of his employment, but plaintiff did not comply. Plaintiff did not satisfy his burden. See *Gen Motors Corp*, 469 Mich at 186.

Moreover, even assuming that plaintiff satisfied his burden with regard to a prima facie case, there is no genuine issue of material fact concerning: (1) whether defendant offered a legitimate, nonretaliatory reason for its termination decision; or (2) whether, construing the evidence in a light most favorable to plaintiff, a trier of fact could conclude that the cited reason was mere pretext. See *Cuddington*, 298 Mich App at 276-277. First, the legitimate, nonretaliatory reason cited by defendant was that plaintiff, who refused to work within the restrictions set forth, had too many unexcused absences during a five-year period. There is no dispute that plaintiff repeatedly failed to work within the restrictions imposed by Dr. Sperl. Defendant gave plaintiff several months and multiple opportunities to come to work with the appropriate restrictions in place, but he failed to do so. Defendant first mentioned terminating plaintiff's employment in May of 2011, but did not do so until August 1, 2011, after giving plaintiff many opportunities to avoid termination. Although Dr. LaClair at times opined that plaintiff could not work under any circumstances, Dr. LaClair ultimately concluded that plaintiff could perform light duty work while avoiding inmate contact. And, although Foco stated, in a July 25, 2011 e-mail that the warden of plaintiff's facility would not accommodate plaintiff's restrictions, she also stated that "we have attempted to accommodate similar restrictions in the past (ie: limited inmate contact) and [plaintiff] could not withstand them." Essentially, the record reveals that defendant gave plaintiff multiple opportunities to avoid termination, but plaintiff failed to take advantage of those. As such, there is no genuine issue of material fact concerning whether defendant offered a legitimate, nonretaliatory reason for terminating plaintiff's employment.

Furthermore, there is no genuine issue of material fact concerning whether the reason given by defendant was mere pretext. "A plaintiff can establish that the employer's proffered reasons for the adverse employment action qualify as pretextual by demonstrating that the reasons (1) had no basis in fact, (2) were not the actual factors motivating the decision, or (3) were insufficient to justify the decision." *Cuddington*, 298 Mich App at 277. The stated reason for termination—that plaintiff had too many unexcused absences, had a basis in fact, as it is

undisputed that plaintiff did not report to work despite being cleared for restricted duty, and that he missed too many days of work. Further, there is no genuine issue concerning whether defendant's stated reason for termination was the actual factor motivating termination. Defendant began warning plaintiff in May of 2011 that his employment would be terminated if he did not return to work under restrictions or provide documentation for his absence. Plaintiff never returned to work for more than a few hours at a time, nor did he provide documentation for his absence. Indeed, Dr. Sperl consistently opined that plaintiff could work with the very restrictions under which plaintiff refused to work. Dr. LaClair even opined, ultimately, that plaintiff could return to work under similar restrictions as those imposed by Dr. Sperl. Yet, plaintiff did not return to work under those restrictions. Furthermore, the reason cited by defendant was sufficient to justify the decision to terminate plaintiff's employment, as plaintiff missed several months of work with no excuse, bringing his total unexcused absences over the maximum threshold set forth in his union contract.

Affirmed.

/s/ Kathleen Jansen
/s/ Patrick M. Meter
/s/ Jane M. Beckering