# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 21, 2016

Plaintiff-Appellant,

v

No. 327168
Jackson Circuit Court
LC No. 12-004572-FC

GREGORY DONELL PATTERSON,

Defendant-Appellee.

Before: STEPHENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM.

A jury convicted defendant of three counts of first-degree criminal sexual conduct (CSC-I) based on allegations that he engaged in forced sexual intercourse with the 12-year-old daughter of his live-in girlfriend. The trial court subsequently granted defendant's motion for a judgment of acquittal notwithstanding the verdict (JNOV). In making this ruling, the court mischaracterized the victim's testimony and other evidence and specifically weighed the credibility of the witnesses. The court was not permitted to invade the jury's verdict in this fashion. We therefore reverse and remand for reinstatement of defendant's convictions and for sentencing.

## I. BACKGROUND

In the spring of 2012, the victim, AD, was 12 years old. She lived with her mother, Angela, and older brother. Defendant, Angela's boyfriend, had lived in the home with them for approximately two years.

AD alleged that on an evening just before spring break, defendant sexually assaulted her. AD described that she was in the kitchen when defendant entered and asked "can he stick it in." Defendant grabbed AD's arm firmly, but not hard enough to leave a bruise, and guided her into the connected dining room. Defendant sat down in a chair, pulled down AD's shorts and underwear, and "gently pushed [AD] down on him." AD testified that defendant penetrated her "front private" with his penis. Defendant then instructed AD to stand and bend over, and "grab onto the chair arms." He "put it [his penis] in [her] butt." When defendant finished, AD pulled her pants up. Defendant "slapped [her] butt" and told her to fetch a box of dominos. Defendant and AD started playing and her brother joined them soon after. The brother testified at trial that nothing appeared amiss with AD that evening.

-1-

After the dominos game, AD went upstairs to use the bathroom. She described that "[i]t burned" when she urinated. She noticed some blood, but "[n]ot a lot," in the toilet and when she wiped. Nervous about her condition, AD told her mother of defendant's actions. AD claimed that her mother confronted defendant but that nothing "change[d] after that." Angela passed away before the trial.

AD also accused defendant of molesting her several times, possibly in the following week. AD enjoyed lying on her mother's bed to watch television. She asserted that defendant came in on various occasions and put his hand inside her shorts, inserted his forefinger into her vagina, described her vagina as "wet," and asked if he could do it again. AD described incidents when defendant attempted to force her to perform fellatio and forced her to fondle his penis. On another occasion, defendant made her sit on his lap while he "move[d] back and forth."

Approximately two weeks after the assault in the dining room, AD reported her abuse to her maternal grandmother and aunt. They contacted the police and took AD to the hospital. Physician assistant Jennifer Underwood conducted pelvic and rectal examinations. Underwood testified that AD reported "some vaginal bleeding and bleeding from her rectum . . . for several days following" the assault. Underwood observed no "fissures, tears, scarring, [or] ruptures" to AD's rectum. In the vaginal area, Underwood noted "tender[ness] on [AD's] left labia minora." Underwood could not rule out sexual assault despite the lack of noticeable injury because two weeks had passed and "everybody heals their wounds at their own body's speed."

Pediatrician Lisa Markman examined AD another week later. After describing the abuse, AD reported "that afterwards it was hard to go to the bathroom and that there was a little bit of blood." Dr. Markman also conducted a pelvic and rectal exam, including an examination of AD's hymen. The results "were normal with no signs of acute trauma so nothing that looked like bruising or bleeding" or like "scar tissue." Dr. Markman also could not rule out sexual abuse, however. She dispelled popular mythology that a woman's hymen is a solid flap that is automatically ruptured during penetration. Rather, it is a tissue membrane that may only partially close this opening.[1] She noted that vaginal tissue is much like mouth tissue and heals very quickly. Dr. Markman further explained that damage might not occur if the penetration was shallow. A child victim may not realize how shallow an assailant's penetration is, as even a minimal level of intrusion "can be uncomfortable."

Following AD's report, officers collected the clothes she had been wearing during the assault. AD provided a pair of orange and yellow flowered shorts and informed the officers they had not been washed since the incident and she had worn them in the meantime. AD was less certain whether she actually donned the underwear she provided. Subsequent testing produced no evidence from the underwear. However, the analyst found seminal fluid matching defendant's DNA on AD's shorts. The affected area was "around the size of a quarter." It was located "on the outside back of the shorts." The analyst could not definitively assert that the seminal fluid was originally deposited on the outside, rather than the inside, of the shorts,

---

[1] See also <http://c.merriam-webster.com/medlineplus/hymen> (accessed June 10, 2016).

explaining "depending on the material . . . a wet sample could seep through so you can't really tell if it's from the inside or the outside."

The day after the police report, defendant voluntarily went to the station for an interview. Without knowing the specific allegations against him, defendant asserted that he had never been alone with AD. He conceded that Angela had confronted him on the night in question regarding AD's accusation. Defendant informed the officer that he had told Angela that any potential inappropriate contact would have been accidental and could only have occurred when he tried to extricate AD after she jumped too roughly on his back. He thereafter denied the more specific allegations outlined to him.

Defendant did not take the stand at trial. Instead, counsel attacked AD's veracity and attempted to lure her into testifying that she fabricated the allegations because she disliked him and wanted her parents to reunite.[2] Counsel elicited testimony from AD that she was not "afraid" of defendant after the alleged assault and was still comfortable going into the bedroom he shared with her mother. Defense counsel questioned the pediatrician and physician assistant who examined AD about the lack of noticeable injury, characterizing AD's testimony as describing a "violent" rape and "anal sodomy." Counsel also posited that the seminal fluid could have transferred onto AD's pants while she lay on her mother's bed and verified the possibility of this with the forensic analysts.

At the close of the prosecution's case-in-chief, defendant filed a motion for a directed verdict of acquittal. Counsel lamented the "dearth of information and . . . lack of quality witnesses" facing his client. He accused AD of "chang[ing] her story so many times that we can't make heads or tails of which is which." He challenged the experts' prognoses that a child assaulted by a grown man could "heal[] almost overnight" and leave no trace of the act. He characterized AD as saying, "I want to get rid of him and I hate him" about defendant. Counsel expressed amazement that "[t]he blood that she claimed that she experienced after being so brutally . . . attacked . . . doesn't appear on [AD's] shorts or underwear."

The trial court denied defendant's directed verdict motion, accurately noting that it was required "to view the evidence in a light most favorable for the non-moving party to draw all reasonable inferences in favor of the non-moving party[.]" The court continued:

> You know I will indicate that the Court has some serious concerns about the
> evidence and whether it in fact is enough . . . to prove beyond a reasonable doubt.
> And at this point I'm just indicating that, but . . . I believe that as a matter of fact
> in law it would be erroneous for the Court at this point to direct a verdict, because

---

[2] In this regard, AD admitted that she did not always like defendant and that she wanted her parents to reunite, despite that she had never met her father. AD admitted that she had disliked other boyfriends with whom her mother had associated. She denied, however, that she had "done something before to help get rid of them." AD conceded that she "had a history of lying" and was "pretty good at lying" "depend[ing] on what it is," but claimed that she never lied about things that "are too important."

clearly every reasonable inference has to be extended to the state at this juncture. So, I'm going to allow the matter to go the jury and . . . there's going to be some tough factual issues they're going to have to make and determine whether the state's met its burden as to all the essential elements . . . .

The jury subsequently convicted defendant of three CSC-I counts: one for digital-vaginal penetration in Angela's bedroom, one for penile-vaginal penetration in the dining room, and one for penile-anal penetration. The jury acquitted defendant of charges connected to AD's allegations of attempted fellatio and other sexual touching.

Defendant thereafter filed a "motion for judgment notwithstanding verdict and in the alternative motion for new trial." The motion was based on defendant's description of the sexual assault in the dining room as "violent" and "sodomy." Such violence, defendant posited, would necessarily leave some physical trace a doctor could discover. Defendant inaccurately stated that AD alleged two anal penetrations, instead of one. He incorrectly averred that defendant complained of significant bleeding, and marveled at the lack of blood on AD's underwear and shorts. Defendant further challenged the finding of only a trace amount of seminal fluid on the exterior of AD's shorts in light of such an encounter. Defendant theorized that this material transferred while AD was lying on her mother's bed. Defendant then focused on AD's veracity, noting her demeanor immediately after the attack, lack of fear in the following weeks, and history of lying to oust her mother's boyfriends from their house. Allowing defendant's convictions to stand in the face of such minimal evidence and questionable victim veracity would be a miscarriage of justice, defendant urged.

Defendant continued this thread at the hearing on his motion. In response to the prosecution's clarification that AD never testified the assault was "violent," defense counsel retorted, "those of us who heard the record that her position was that he grabbed her with no preamble, pulled her pants down and with his penis did violate her anus more than once and her vagina at least once perhaps twice. Your honor, I don't know if there's any other way to describe that other than violent." Counsel continued that AD "asserted that she bled quite a bit," but there was no blood found on the underwear or shorts that she continued wearing immediately after the assault. Counsel argued that a lack of physical corroboration based on the physician assistant finding no trauma or injury "doesn't make sense whatsoever since she was there with an allegation of a sexual assault anally and violently." Counsel reiterated his claim that AD "testified that she lied and she had lied in the past about her mother's boyfriends in order to get them out of the house." In the legal portion of counsel's argument, he asserted:

And I understand that the Court had to deny my motion for directed verdict because the rules are very clear. The Court had to accept everything that was said by [the] alleged victim as being true in the light most favorable to the People. But, as this Court has said on so many occasions, you are the gatekeeper. . . . The Court has a duty and the responsibility where there is a potential miscarriage of justice . . . to step in and set aside a verdict.

Before entering its ruling, the court inquired of defense counsel how long he had practiced and how many motions for JNOV he had filed. Counsel responded that in his 20 years of practice, this was his first such motion. The court then ruled in full:

Um, in all the years I've been on the bench, which this now my 13th year um, for the most part I think juries do a good job getting it right. More often than not a very high percentage of the case[s] the jury does exactly what . . . I would probably . . . have done if I had heard the matter as a bench trial. I was a prosecutor for most of my career. . . . I tried a lot of cases. . . . And this is one of those cases it bothered me because when all the evidence came in the Court understood its role and the case law when it came for the motion for directed verdict that I had to view the evidence to the light most favorable to the non-moving party. So, specifically as an example I had to believe this victim's testimony even if I didn't find it credible because I had to give every possible reasonable inference uh, in favor of the non-moving party specifically the prosecution. And frankly I thought that the jury would come up with a very different verdict. At the conclusion I clearly believed that there were some major problems uh, with the state's case, especially starting right out with the victim. And first of all we've got this alleged anal and vaginal rape. She's allegedly got this large amount of bleeding um, but she goes up and changes her underwear and ultimately . . . is comfortable enough where she's playing dominos with her brother in a relatively short period of time you know after this alleged vaginal and anal rape. Uh, then there was some inconsistencies about the amount of time it occurred. There didn't seem to be any supporting evidence from Dr. Markman about any tearing of the hymen. Uh, in fact as I recall her testimony the hymen was still intact. The victim testified at some length about how in the past she's actually lied uh, and misrepresented things to get other men out of her household with her mother. And that's a very major concern to the Court, because in effect she's found by way of manipulation and misrepresenting things to her mother that she can effectively move somebody out of the home. Then when we talk about this evidence of the DNA, I recall the testimony specifically on that. She testified that she had a regular if you want to call it a modus operandi or method of operation she would routinely on almost a daily basis would get into the marital bed, lay down on the marital bed and . . . watch TV because her mother had a much nicer TV tha[n] she had in her own bedroom. I don't think there's a man here in this courtroom that hasn't worn a condom that isn't going to say that there's not some level of seminal fluid that can be present in a liquid form uh, you know on my some sheets. And again if we're talking a microscopic amount of evidence in this case, it was a microscopic amount. I believe that an expert could easily make that determination that any amount of wet seminal fluid could have very easily transferred onto the shorts in this case. And again I would underscore that it was a microscopic amount. Um, you know I was also even concerned from the very beginning I don't know that this had any impact at all it's one of the few juries I ever selected that I had an all white jury and I had jurors commenting on the fact that they thought it was unfair to the defendant uh, the fact that he was going to ultimately face an all white jury. That might be a separate issue, but again it was just something else on top of everything else that occurred in this case. I don't think I even saw the victim or the victim's family, which I tend to see at the end of the case. So, I don't know where that - - you know but normally they're here, normally they're watching the case at the end. Um, but what is a

real significance to me is the fact that I think that there is [a] totally other plausible view of the evidence that certainly could have supported uh, that the case was not proven beyond a reasonable doubt. And so I'm going (inaudible) - - something I've done in my entire career of 13 years on the bench, almost 20 some years of prosecution and defense experience and I'm going to enter a judgment notwithstanding the verdict. And, uh, you know frankly I don't want to sit there at night and wonder if I sent an innocent man to prison and especially for criminal sexual conduct charge. He doesn't have a history of that, um, he struck me also during the trial was very attendant, very polite, you know um, he just didn't seem to carry even the demeanor of somebody that was guilty. And at this point in time you know if the appellate courts want to think about what I said it's just one of those verdicts that I think potentially is a miscarriage of justice. So, the judgment notwithstanding the verdict is entered by this Court.

## II. ANALYSIS

The prosecution now appeals the trial court's dismissal of defendant's convictions. We review de novo a trial court's decision on a motion for JNOV. *People v Duenaz*, 148 Mich App 60, 64; 384 NW2d 79 (1985). When considering a JNOV motion, the court must view the evidence and any inferences arising therefrom in the light most favorable to the nonmoving party and determine if contrary to the jury's verdict, "the evidence viewed in this light fails to establish a claim as a matter of law." *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 131; 666 NW2d 186 (2003). In a criminal matter, this means a defendant is entitled to a post-trial judgment of acquittal if the evidence, viewed in the light most favorable to the prosecution, is insufficient to meet the elements of a charged offense beyond a reasonable doubt. *People v Solak*, 146 Mich App 659, 679; 382 NW2d 495 (1985).

Defendant alternatively requested a new trial, contending that his convictions were against the great weight of the evidence, MCR 2.611(A)(1)(e), and resulted in a miscarriage of justice, MCR 6.431(B). Should we overrule the trial court's JNOV ruling, defendant contends that we should remand for consideration of his new trial motion. We will consider these two requests together as defendant was entitled to neither for reasons that are quite similar.

"Under statute, as well as the court rule, the operative principles regarding new trial motions are that the court 'may,' in the 'interest of justice' or to prevent a 'miscarriage of justice,' grant the defendant's motion for a new trial." *People v Lemmon*, 456 Mich 625, 634-635; 576 NW2d 129 (1998). Such a motion may also be granted when the jury's verdict is against the great weight of the evidence. *Id.* A verdict is against the great weight of the evidence when "the evidence preponderates heavily against the verdict." *Id.* at 642. In considering such a motion, the trial judge may not act "as a '13th juror' " and overturn a jury's verdict because he or she has a different view of the witnesses' credibility. *Id.* at 636.

> The historic division of functions between the court and the jury needs no citation of authority. It is the province of the jury to determine questions of fact and assess the credibility of witnesses. As the trier of fact, the jury is the final judge of credibility. The approach that would allow a trial judge to sit as a thirteenth juror and overrule the credibility determinations of the jury suggests that a judge may

freely repudiate the jury's findings. [*Id.* at 636-637 (quotation marks and citations omitted.)]

There are scant exceptions to this fundamental principle. A court may only intervene when:

> the testimony contradicts indisputable physical facts or laws, where testimony is patently incredible or defies physical realities, where a witness's testimony is material and is so inherently implausible that it could not be believed by a reasonable juror, or where the witnesses' testimony has been seriously impeached and the case marked by uncertainties and discrepancies. [*Id.* at 643-644 (quotation marks and citations omitted).]

Where "[t]he question [is] one of credibility posed by diametrically opposed versions of the events in question, [a] trial court [is] obligated, 'despite any misgivings or inclinations to disagree,' to leave the test of credibility where statute, case law, common law, and the constitution repose it[:] 'in the trier of fact.' " *Id.* at 646-647.

To view the evidence in the light most favorable to the prosecution in relation to the JNOV motion, the court was required to accept the witnesses' testimonies as credible and draw all reasonable inferences in favor of the prosecution, just as when considering a motion for a new trial. The court did not do so here. Instead, it mischaracterized the evidence, discredited the experts, and found the victim patently incredible based, in part, on alleged testimony that she did not actually provide. For these reasons, we must reverse the trial court's grant of JNOV, reject defendant's bid to remand for a new trial, and reinstate defendant's convictions.

First and foremost, the court mischaracterized several key pieces of evidence, possibly carried away by defense counsel's rhetoric. There is absolutely no evidence that defendant twice penetrated AD's rectum with his penis. AD described only one such penetration during her testimony. AD never described the assault or the penetration as "violent." Rather, she asserted that defendant "gently pushed" her onto his lap, implying that the penetration was slow or gentle. The court described that AD suffered a significant amount of bleeding after the sexual assault. However, AD testified that she noticed only "some" blood when she went to the bathroom. She specifically rejected defense counsel's description that she bled "like a stuffed pig." The court stated that AD admitted to lying about her mother's boyfriends in the past to secure their removal from her home. In actuality, AD expressly denied that charge. Although AD conceded that she had a history of lying, she denied that she had ever lied about anything of import and had never secured the eviction of her mother's boyfriends in this fashion.

The court seemingly ignored the testimony of physician assistant Underwood and Dr. Markman regarding vaginal anatomy, victim misconception of penetration, and the body's healing powers. This testimony explained why the medical professionals could not rule out a penetration despite the lack of noticeable injury. Defense counsel theorized that it was nonsensical that no injury would be visible after such an allegedly violent and forcible rape, but his cross-examination did not yield the "ah-ha" moment he was looking for.

If the jury accepted the medical evidence actually provided, it could determine beyond a reasonable doubt that a sexual penetration occurred as described by AD. Specifically,

Underwood testified that beyond a 72-hour window, evidence of a sexual assault is rarely found during an examination. Bruises, tears and fissures often heal quickly, both experts reported. Such injuries will not occur if the assailant penetrates only the entry of a victim's genitalia or rectum. Even this minimal entry would be "uncomfortable" to the child victim, Dr. Markman explained. And even such a minimal entry supports a CSC-I conviction. See MCL 750.520a(r) (" 'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required."). If the sexual penetration were "slight," no injury would be occasioned to the victim's hymen, as noted by Dr. Markman. Indeed, AD never testified regarding the depth of defendant's intrusion and defense counsel asked no questions to clarify this point.

In relation to the forensic evidence, the absence of blood on AD's shorts and underwear did not dictate against a guilty verdict, contrary to the trial court's assessment. As noted, AD actually testified that the bleeding was not significant. Moreover, she was uncertain whether the underwear she provided to the officers was the underwear she wore that night. AD claimed that the clothing had not been washed, but she testified that defendant cleaned her room and did her laundry, limiting her confidence in this regard.

In relation to the presence of minimal seminal fluid on AD's shorts, the court and defense counsel ignore the elephant in the room: AD never claimed that defendant reached ejaculation. And the "emission of semen is not required" to find a sexual penetration. MCL 750.520a(r). Defendant posited an alternate theory for the presence of the semen on AD's shorts, and the forensic experts admitted that the material could have been transferred from defendant and Angela's bedding. Even so, the jury could still believe that defendant committed a sexual penetration against AD in the home's dining room but did not emit semen in the process.

Given the court's mischaracterization of the victim's testimony and the medical and forensic evidence, the court apparently leapt to the incorrect conclusion that AD's version of events "defie[d] physical realities." *Lemmon*, 456 Mich at 643. Accurately read, the record simply does not support this conclusion.

Nor does the record support that AD's testimony was so "inherently implausible" or so "seriously impeached" that "it could not be believed by a reasonable juror." *Id.* at 644. AD admitted her history of lying, but expressly denied that she relied on fabrication to unseat defendant or any other man as Angela's boyfriend. No witness corroborated defendant's theory in this regard. Although AD's brother did not believe AD's allegations against defendant, he did not describe her as a liar. The court's discrediting of AD's testimony therefore invaded the jury's sacred sphere.

The court also invaded the role of the jury when it determined from defendant's demeanor while he sat in the courtroom that he was innocent of the charges against him. The jury had an equal opportunity to observe defendant. But defendant did not testify and therefore made no statements through which his credibility could be assessed. Ultimately, the court placed

itself as a 13th juror, contrary to clear legal precedent. As such, the JNOV decision cannot be allowed to stand. And we discern no ground supporting a new trial, negating the need for a remand to consider this alternate remedy.[3]

The prosecution additionally requests that defendant be sentenced before a different judge based on the trial judge's statement, "I don't want to sit there at night and wonder if I sent an innocent man to prison." In *People v Evans*, 156 Mich App 68, 72; 401 NW2d 312 (1986), this Court set forth three factors to consider in determining whether reassignment is necessary on remand:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

That a judge's ruling is reversed does not demand the effective disqualification of the judge on remand. *People v Page*, 83 Mich App 412, 419-420; 268 NW2d 666 (1978).

Although the trial judge believed the jury inaccurately assessed the evidence in this case, our opinion specifically instructs the judge of his error. Armed with our detailed opinion, we see no reason to believe the judge will stray from the law in favor of personal prejudices. The trial judge is familiar with the case and a newly assigned judge would have to acquaint him or herself with the facts before sentencing. The need to "preserve the appearance of justice" is not so strong to trump other considerations.

Accordingly, we reverse and remand to the trial court for reinstatement of the jury's verdict and for sentencing. We do not retain jurisdiction.

/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher

---

[3] Unrelated to the evidence presented on the record, the trial court also considered the seeming injustice of defendant being tried and convicted by an all-white jury. Defendant raised no challenge to the racial composition of the jury and actively participated in jury selection. Given this record, we discern no error demanding relief in this regard.