*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DARRELL F. TURNER,

       Plaintiff-Appellant,

v

GENERAL MOTORS, LLC,

       Defendant-Appellee.

UNPUBLISHED
October 12, 2023

No. 360709
Wayne Circuit Court
LC No. 2019-007309-CD

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff, Darrell F. Turner, appeals as of right the trial court's opinion and order granting summary disposition in favor of defendant, General Motors, LLC, pursuant to MCR 2.116(C)(10) in this action alleging claims of race and age discrimination, retaliatory discharge, and hostile work environment. We affirm.

Plaintiff, a Black male who was 44 years old when he filed this action in May 2019, worked for defendant as a contract worker in its electrical design group from 2010 to 2013, when he was hired as a direct employee. He remained in his position until his termination in September 2018. Plaintiff claimed that he experienced discrimination by Ken Arterburn, the design lead technical ("DLT"), from whom plaintiff received assignments, and also by being denied work-from-home privileges by Dale DiBartolomeo, plaintiff's manager from November 2015 until late December 2017. In particular, plaintiff claimed that, in 2015, Arterburn bragged that his family previously owned or auctioned slaves, and he showed plaintiff a photo from a website that showed an historic location in Kentucky where slaves were auctioned by a business known as the Arterburn Brothers. In 2016, Arterburn told plaintiff about a group of Black individuals Arterburn had seen near his residence around 4:00 or 5:00 a.m. Arterburn said he did not recognize the individuals and thought they were staking out his subdivision, and told plaintiff that he yelled at them and told them that he was going to call the police. Arterburn again raised the subject of his family's slave ownership in 2016, during Black history month when a group of workers were talking about how horribly Black people had been treated as slaves.

-1-

According to plaintiff, in late 2016 or early 2017, he informed DiBartolomeo and Michael LaBaere, the senior manager of the electrical design group, that he wanted to transfer to another group because he thought that Arterburn was singling him out because of his race and he was working in a hostile work environment. However, plaintiff admittedly did not share with DiBartolomeo or LaBaere any specific circumstances that made him feel that he was being singled out because of his race, or mention the conversations he had with Arterburn. DiBartolomeo and LaBaere both denied that plaintiff told them that he thought he was being singled out because of his race, and they denied plaintiff's transfer request.

Plaintiff alleged that his work-from-home privileges were restricted from March 2017 through October 2017. Plaintiff acknowledged that defendant's work-from-home policy stated that it was up to a manager to decide whether an employee could work from home, and that work from home was a privilege and not a right. Defendant's work-from-home policy also required that employees complete their work and be available through e-mail, telephone, or instant messaging during regular business hours while at home. Plaintiff's work-from-home privileges were reinstated in October 2017, subject to DiBartolomeo's discretion. While working at home on December 21, 2017, plaintiff sent an e-mail to DiBartolomeo asking if he could work from home again on December 22, 2017. DiBartolomeo responded by denying plaintiff's request, stating that it did not appear that plaintiff accomplished any work from home. Plaintiff claimed he did not read DiBartolomeo's response and thought he deleted it accidently. When plaintiff did not appear for work on December 22, DiBartolomeo reminded him of the e-mail.

On January 8, 2018, DiBartolomeo met with plaintiff and asked him what he was doing when he worked at home. DiBartolomeo did not believe that plaintiff was working when he was at home, and he told plaintiff that he was going to recommend to LaBaere and Human Resources (HR) that plaintiff be restricted from working at home. According to plaintiff, he told DiBartolomeo that he felt that he was being singled out because of his race. DiBartolomeo denied that he was singling plaintiff out and told him that other employees had also been restricted from working at home.

On January 12, 2018, plaintiff sent an e-mail to LaBaere that listed plaintiff's concerns about DiBartolomeo, and then met with LaBaere and David Gibson, an HR representative, in LaBaere's office. The e-mail referenced the prior work-from-home restrictions and the "misunderstanding" about whether plaintiff was allowed to work from home on December 22, 2017. Plaintiff explained that after he sent the e-mail request on December 21, he did not realize that DiBartolomeo had sent a response denying the request and, believing that DiBartolomeo had not responded, assumed that he could work from home on December 22. Plaintiff admitted that "it was a hundred percent my fault for not trying to contact him again." Plaintiff also admitted that his e-mail to LaBaere did not mention that plaintiff felt like he was being racially discriminated against or harassed because of his race. Plaintiff told LaBaere that he was concerned that DiBartolomeo was going to change his year-end CAP review.

On February 1, 2018, plaintiff sent to Laurie Marsh, an HR worker, the same e-mail that he previously sent to LaBaere. Marsh referred plaintiff to Gibson, who spoke to plaintiff later that day. Plaintiff's e-mail to Marsh did not mention race, harassment, or discrimination. According to plaintiff, however, in his conversation with Gibson, plaintiff stated that he felt that he was being racially harassed by Arterburn and DiBartolomeo, and that he wanted to transfer to a new group.

On February 7, 2018, plaintiff met with LaBaere, DiBartolomeo, Gibson, and Moise Sunda, who became plaintiff's manager in late December 2017. Plaintiff recorded that meeting. Plaintiff did not raise race or age discrimination at the meeting. Plaintiff found out at the meeting that he was receiving a positive rating on his performance review for 2017, and that he would be receiving a base salary increase and a Team GM bonus. Plaintiff admittedly was very relieved and felt good about the evaluation.

In August 2018, Michael Hines, a co-worker and friend of plaintiff, was promoted to a DLT position and an organization-wide e-mail announcement concerning the promotion was sent to more than 2,000 workers. Hines happens to be Black. Plaintiff responded to the e-mail by selecting "reply all." His response stated: "He must have been buck dancing hard or we're just in the wrong spots." Plaintiff claimed that he did not realize when he sent the e-mail that it was going out to more than 2,000 workers. He thought he was replying to an e-mail from two of his friends. After he realized that he sent the message to everyone, he sent a follow-up apology e-mail. After plaintiff sent the e-mail, he was initially suspended and later terminated.

LaBaere testified that, after consulting with Maureen Berndtson, a senior HR policy consultant, he made the decision to terminate plaintiff's employment because of the e-mail. When LaBaere spoke to plaintiff, plaintiff claimed that "buck dancing" meant a celebratory dance and he thought Hines was probably celebrating by dancing. Plaintiff explained that when he wrote "or we're just in the wrong spots," he meant that if he and his friends wanted a promotion, they should be working for Hines's supervisor. But after speaking with other workers and leaders, LaBaere believed that the context in which plaintiff used the term "buck dancing" was racially derogatory, and that the e-mail was very demeaning, disrespectful, and humiliating toward Hines and undermined Hines's achievement.

According to Gibson, "there was a lot of noise on the floor" after plaintiff sent the e-mail, and the main consensus was that it was very offensive. Berndtson stated that the overwhelming concern among employees in leadership was that the e-mail was racially insensitive and derogatory regarding the promotion of a Black employee. Berndtson thought that the e-mail accused Hines of being an "Uncle Tom" and of "sucking up" to get his promotion, rather than earning the promotion based on merit. Berndtson did not speak to anyone who thought the e-mail was celebratory of Hines's promotion. Hines himself stated that he felt upset, angry, embarrassed, and mortified when he read plaintiff's e-mail. He viewed it as a racial slur and thought it insinuated that he performed for a "white master" in order to gain favor for a promotion that he did not deserve. He asked to leave his desk for a while to recover from his embarrassment over the e-mail. Hines's manager, Sharon Bickley, was also upset because she felt that the e-mail questioned the integrity of her promotion process.

LaBaere felt that plaintiff's actions and behavior were so egregious that they warranted immediate dismissal, and he never considered providing plaintiff with a "Last Chance Letter." Gibson explained that other workers had been issued Last Chance Letters to address behavioral or performance issues that are not significant enough to result in termination, but he supported the decision to terminate plaintiff's employment without a Last Chance Letter because of the seriousness of the matter. Berndtson explained that she recommended termination because the e-mail violated defendant's Winning with Integrity and Core Values policy. On September 4, 2018, plaintiff was terminated from his employment on the basis of misconduct because of the e-mail.

In October 2018, defendant hired 26-year-old Evan Campbell in its electrical design department. Campbell had originally begun working for defendant in the same department in a contract position in January 2016. Campbell worked on seat, headliner, and battery wiring, but unlike plaintiff, he had never worked on fascia harness wiring, either as a contract worker or a direct employee.

In May 2019, plaintiff filed this action and asserted claims for race and age discrimination, unlawful retaliation, and hostile work environment based on race. Defendant filed a motion for summary disposition under MCR 2.116(C)(10). In deciding the motion, the trial court found that plaintiff established a prima facie case of race discrimination, but that defendant had provided a legitimate nondiscriminatory reason for plaintiff's discharge—plaintiff's dissemination of a racially offensive e-mail to more than 2,000 workers—and plaintiff failed to present evidence to establish a genuine issue of material fact regarding whether the e-mail was a pretext for unlawful discrimination.

The court found that plaintiff failed to establish a prima facie case of age discrimination because there was no evidence that he was replaced by a younger person. Regarding plaintiff's hostile-work-environment claim, the trial court found that Arterburn's comments did not rise to a level of intimidating, hostile, or offensive conduct that interfered with plaintiff's employment. The court also found that plaintiff failed to establish that defendant was aware of the alleged treatment or harassment. Finally, the court dismissed plaintiff's claim of retaliatory discharge for failure to establish a causal connection between plaintiff's alleged protected activity and his termination, and failure to establish that defendant's legitimate business reason for plaintiff's termination was pretextual. Accordingly, the trial court granted defendant's motion for summary disposition and dismissed plaintiff's claims. This appeal followed.

## I. STANDARD OF REVIEW

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is appropriate under MCR 2.116(C)(10) if, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." The moving party "must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact" and support its motion with documentary evidence. *Maiden*, 461 Mich at 120, citing MCR 2.116(G)(4). To survive a motion for summary disposition, the party opposing the motion must set forth specific facts establishing a genuine issue of material fact for trial. *Id*. at 120-121, citing MCR 2.116(G)(4). A genuine issue of material fact exists when the evidence presented "leave[s] open an issue upon which reasonable minds might differ." *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013) (quotation marks and citation omitted).

## II. RACE AND AGE DISCRIMINATION

The Michigan Civil Rights Act (CRA), MCL 37.2101 *et seq.*, bars discrimination on the basis of race or age. Specifically, MCL 37.2202 provides, in relevant part:

(1) An employer shall not do any of the following:

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

To survive a motion for summary disposition in an age or race discrimination case, the plaintiff must present evidence that, when construed in a light most favorable to the plaintiff, will permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff. *Hazle v Ford Motor Co*, 464 Mich 456, 465; 628 NW2d 515 (2001). A plaintiff may prove age or race discrimination through different methods. *Meagher v Wayne State Univ*, 222 Mich App 700,708; 565 NW2d 401 (1997). "Proof of discriminatory treatment in violation of the CRA may be established by direct evidence or by indirect or circumstantial evidence." *Major v Village of Newberry*, 316 Mich App 527, 540; 892 NW2d 402 (2016), quoting *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124, 132; 666 NW2d 186 (2003). Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions, and a plaintiff is required to present direct proof that the discriminatory animus was causally related to the adverse employment decision. *Sniecinski*, 469 Mich at 133-135. Plaintiff does not argue that he presented direct evidence to support his discrimination claims.

If a plaintiff does not have direct evidence of discrimination, the plaintiff may proceed under the burden-shifting framework in *McDonnell Douglas Corp v Green*, 411 U S 792; 93 S Ct 1817; 36 L ED 2d 668 (1973). *White v Dep't of Transp*, 334 Mich App 98, 107; 964 NW2d 88 (2020). For a claim based on termination of employment on the basis of race or age, the plaintiff may rely on evidence that he was replaced by someone outside his protected class, or that he was treated differently than similarly situated employees outside the protected class for the same or similar conduct. *Meagher*, 222 Mich App at 709.

To establish a prima facie case of race or age discrimination, plaintiff was required to present evidence that (1) he belonged to a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the position, and (4) he was discharged under circumstances that give rise to an inference of unlawful discrimination. *Lytle v Malady*, 458 Mich 153, 172-173; 579 NW2d 906 (1998); *Hazle*, 464 Mich at 463. Circumstances give rise to an inference of discrimination when the plaintiff is "treated differently than persons of a different class for the same or similar conduct." *Reisman v Wayne State Univ Regents*, 188 Mich App 526, 538; 470 NW2d 678 (1991). In a case alleging age discrimination, a plaintiff may satisfy the fourth element by showing that he was replaced by a younger person. *Major*, 316 Mich App at 540-541.

The parties do not dispute that plaintiff is able to satisfy the first three elements of a prima facie case for both his race and age discrimination claims. At issue is whether plaintiff was treated differently than persons of a different class for the same or similar conduct, and whether plaintiff was replaced by a younger person.

If a plaintiff establishes a prima facie case of discrimination, "a presumption of discrimination arises." *Hazle*, 464 Mich at 463 (quotation omitted). Once a plaintiff establishes a prima facie case of discrimination, the defendant has an opportunity "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created

by the plaintiff's prima facie case." *Id.* at 464. The defendant "has the burden of producing evidence that its employment actions were taken for a legitimate, nondiscriminatory reason." *Id*. If the defendant satisfies that burden, the presumption of discrimination falls away. *Id*. at 465. At this point, "in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. (quotations and citation omitted). A plaintiff is required to not only show that the employer's proffered reason was pretextual, but that it was a pretext for unlawful discrimination. *Id*. at 465-466. "[F]or purposes of a motion for summary disposition . . . , a plaintiff need only create a question of material fact upon which reasonable minds could differ regarding whether discrimination was a motivating factor in the employer's decision." *Id*. at 466.

As the trial court observed, plaintiff demonstrated that he was a member of a protected class due to his race, he suffered an adverse employment action when he was terminated from his employment, and he was qualified for his position as evidenced by his 2018 favorable performance review, in which he was also awarded a salary increase and bonus. Plaintiff argues that he established an inference of discrimination because he was treated differently than two similarly situated white employees, Daniel Birg and Timothy Pittman.

Defendant argues that Birg and Pittman were not similarly situated employees because the relevant aspects of Birg's and Pittman's employment and terminations were not "nearly identical" to plaintiff's. The trial court found that Pittman's situation was dissimilar to plaintiff, but that plaintiff's evidence sufficiently showed that he was similarly situated with Birg, who was terminated in part due to unprofessional e-mails, and that Birg was treated differently because he was given a Last Chance Letter before being terminated.

Pittman, a white employee, was given a Last Chance Letter after he was observed very intoxicated while at work. The Last Chance Letter required Pittman to communicate any late starts or absences to his leader, to provide a doctor's note for any absences, and to report to work no later than 8:30 a.m. Defendant terminated Pittman's employment within months because Pittman violated the guidelines of the Last Chance Letter five times. Birg was terminated on November 20, 2020, after he was transferred to a training group while under a Last Chance Letter. Birg had been experiencing problems with his design assignments and finishing projects in a timely manner. When questioned about his performance issues, Birg sent e-mails to several employees insinuating that someone had changed his work after he saved the files. When it was explained to Birg that it was impossible for anyone to change a file after he saved it, Birg claimed that he needed help with his computer because he must have been having computer problems. Birg's manager explained in an e-mail to an HR representative that Birg spent more time blaming others or his computer for his mistakes than correcting the issues with his work and moving forward.

'Prima facie case' in this context does not mean that the plaintiff produced sufficient evidence to allow the case to go to a jury, but rather that the plaintiff produced enough evidence to create a rebuttable presumption of race discrimination. *Harrison v Olde Financial Corp*, 225 Mich App 601, 607-608; 572 NW2d 679 (1997) citing *Meagher*, 222 Mich App at 710-711. Although the evidence did not show that Birg was terminated solely because of inappropriate e-mails, considering plaintiff's burden in establishing a prima facie case of race discrimination we

will assume without deciding that plaintiff established a prima facie case on the basis that he was treated differently than Birg for similar conduct.

Plaintiff also relies on the evidence that he was replaced by Campbell, who was 28 years old, to support his claim of age discrimination. Campbell was hired by defendant in October 2018, after he had been working in the same department as a contract worker for two years. Campbell worked as a designer assigned to seat wiring, headliner wiring, and battery wiring projects. Conversely, plaintiff worked exclusively on fascia harness wiring, and Campbell had never worked on fascia harness wiring as a contract or direct employee. The trial court did not directly decide whether Campbell was hired to replace plaintiff, but instead found that the evidence failed to show that plaintiff's age was a factor in defendant's decision to terminate plaintiff's employment. To the extent that plaintiff may have established a prima facie case of age discrimination on the basis of defendant's hiring of a younger person into the same department where defendant worked, we agree with the trial court that defendant presented a legitimate nondiscriminatory reason for plaintiff's termination and plaintiff failed to show that this reason was a pretext for age discrimination.

To the extent that plaintiff established a prima facie case of race and age discrimination, defendant had "to articulate a legitimate, nondiscriminatory reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle*, 464 Mich at 464. The evidence showed that defendant terminated plaintiff's employment for the nondiscriminatory reason of disseminating a racially offensive e-mail to more than 2,000 workers.

LaBaere testified that he made the decision to terminate plaintiff's employment the day after plaintiff sent the e-mail regarding Hines's promotion to more than 2,000 employees. LaBaere explained that he felt that plaintiff's conduct in sending the e-mail was so egregious that it warranted immediate dismissal, so he never considered providing plaintiff with a Last Chance Letter. LaBaere thought that plaintiff's e-mail was very demeaning, disrespectful, and had a tremendous impact on Hines's achievement. Although LaBaere admittedly did not understand the e-mail when he first received it, Hines's senior manager explained that the term was racially derogatory in the context of plaintiff's e-mail. LaBaere believed that plaintiff caused disrespect and humiliation to Hines, during what should have been a proud moment for him. LaBaere also spoke with his manager, Gary Gantt, a Black male, about the e-mail and Gantt had the same reaction, one of shock at plaintiff's total lack of respect for the situation and Hines.

Maureen Berndtson, a senior HR policy consultant, was also involved in plaintiff's termination, but only as a consultant. Berndtson stated that the overwhelming concern among employees in leadership was that the e-mail was racially insensitive and derogatory regarding the promotion of a Black employee. Berndtson thought that the e-mail accused Hines of being an "Uncle Tom" and of "sucking up" to get his promotion, rather than earning the promotion based on his merit. Berndtson thought that the e-mail undermined the selection process, and that it also suggested that Hines was not actually qualified for his new position. Berndtson did not speak to anyone who thought that the e-mail was celebratory of Hines's promotion. Berndtson consulted with two Black colleagues, Terri Flewellyn and Sharon Ridgell, about the e-mail when she was considering her recommendation. Berndtson recommended termination because the e-mail violated defendant's Winning with Integrity and Core Values policy.

Hines testified that when the e-mail arrived in all the employees' inboxes, every employee in his department turned to look at him. Hines testified that in the context of the e-mail, "buck dancing" was a racial slur. Hines stated that as a reply to an e-mail announcing his promotion, plaintiff's e-mail insinuated that Hines performed for a "white master" in order to gain favor for a promotion he did not deserve. Hines did not believe that plaintiff's e-mail was congratulatory, and instead understood it as an insult. Hines explained that he felt upset, angry, embarrassed, and mortified when he read plaintiff's e-mail. Hines felt that the e-mail was a "slap in the face" for earning a promotion. He asked to leave his desk for a while to recover from his embarrassment over the e-mail reaching more than 2,000 employees.

David Gibson, the HR representative, testified that "there was a lot of noise on the floor" after plaintiff sent his e-mail, and the main consensus was that it was very offensive. Gibson spoke to Hines and leadership about the incident. Hines was very upset and had received many instant messages from other employees. Sharon Bickley, Hines's manager, was upset because she felt that the e-mail questioned the integrity of her promotion process. Gibson did not make the decision to terminate plaintiff's employment, but he supported LaBaere's decision.

We agree with the trial court that defendant satisfied its burden of producing a legitimate, nondiscriminatory reason for plaintiff's termination. Therefore, to survive summary disposition, plaintiff was required to present evidence that would permit a reasonable trier of fact to conclude that discrimination was a motivating factor in defendant's decision. *Hazle*, 463 Mich at 465. Plaintiff was required to not only show that defendant's proffered reason was pretextual, but that it was a pretext for unlawful discrimination. *Id.* at 465-466.

Plaintiff argues that he produced evidence that defendant's reason for terminating his employment—the offensive e-mail—was a pretext for race and age discrimination because he testified that he did not intend the e-mail to be racially derogatory. He further argued that there is a question of fact whether buck dancing is a celebratory dance without negative racial connotations, that defendant failed to conduct a reasonable inquiry into the meaning behind buck dancing, and that defendant never offered plaintiff a Last Chance Letter or a performance improvement plan (PIP) as it had done for other employees for similar behavior.

Plaintiff's arguments regarding his intentions and the meaning of buck dancing or the scope of defendant's research into the meaning of buck dancing are arguments related to defendant's business judgment in making its termination decision. Our Supreme Court has explained:

> The plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. [*Hazle*, 464 Mich at 476 (quotation and citation omitted).]

In any event, defendant's evidence demonstrated that it did investigate the meaning of the term and how it was perceived by other workers and leaders, including Hines himself, the subject of the e-mail. LaBaere, Gibson, and Berndtson testified that they did not speak to one employee who believed that the term was used in a context that was intended to be congratulatory toward Hines. On the contrary, according to LaBaere, Gibson, and Berndtson, the feedback they received from other managers and employees was that plaintiff's e-mail was racially derogatory and

demeaning, and violated defendant's Winning with Integrity Code. Plaintiff's arguments question whether defendant's interpretation of the e-mail was wrong or mistaken, not whether it was driven by discriminatory animus. *Hazle*, 464 Mich at 476. Defendant evaluated plaintiff's behavior within the context that the statement was made and recipients' reactions to the statement. Plaintiff failed to establish a genuine issue of material fact whether discrimination was a motivating factor in defendant's decision to terminate his employment. *Id.* It is not enough merely to allege that defendant misunderstood or misinterpreted plaintiff's email in the exercise of its business judgement to terminate him.

We disagree with plaintiff's argument that he presented sufficient evidence to show that his e-mail was a pretext for unlawful discrimination because he was treated differently than similarly situated employees who were offered Last Chance Letters or PIPs. Plaintiff presented evidence of defendant's treatment of Birg and Pittman. Birg was offered a Last Chance Letter because of poor work performance. The parties do not dispute that plaintiff's termination was unrelated to his work performance. While Birg did send e-mails that his manager deemed unprofessional, the e-mails were considered to be excuses for his poor work performance and evidence that Birg thought it was more important to excuse his poor performance, rather than improve it. Birg's emails were also not sent department-wide. With regard to Pittman, the evidence established that he had a problem with alcohol and was given a chance to abide by the rules set forth in a Last Chance Letter in dealing with his persistent alcohol problem.

Unlike Birg and Pittman, the conduct that led to plaintiff's termination did not involve his work performance. Rather, it involved conduct that was deemed to be racially derogatory, insensitive, and questioned the integrity of defendant's promotion process, and which was disseminated to more than 2,000 workers. LaBaere explained that he never considered offering plaintiff a Last Chance Letter because plaintiff's actions were so egregious that they warranted immediate dismissal. Considering the nature of the e-mail, plaintiff failed to demonstrate that his conduct was similar to the performance problems that led to the issuance of Last Chance Letters to Birg and Pittman, and did not otherwise demonstrate a question of fact whether the offensive e-mail was a pretext for unlawful discrimination.

Similarly, plaintiff failed to demonstrate that the hiring of Campbell created a genuine issue of material fact regarding whether plaintiff's termination was driven by discriminatory animus because of plaintiff's age. As indicated earlier, plaintiff's criticisms of defendant's reasons for his termination do not establish discriminatory animus. Moreover, plaintiff did not present any evidence of any bias by defendant because of plaintiff's age. Indeed, Campbell had worked in the department for two years as a contract worker, and merely remained in the same job as a direct hire.

In sum, plaintiff failed to present evidence that defendant's legitimate, nondiscriminatory reason for termination was pretextual, let alone that it was a pretext for unlawful discrimination. *Hazle*, 463 Mich at 465-466. The evidence does not raise a genuine issue of material fact regarding whether discrimination was a motivating factor in defendant's decision. *Id.* at 466. Accordingly, the trial court did not err by granting defendant's motion for summary disposition with respect to plaintiff's race and age discrimination claims.

## III. RETALIATION

Plaintiff argues that the trial court erred by dismissing his retaliation claim. We disagree.

Section 701 of the Civil Rights Act, MCL 37.2701, provides, in relevant part:

Two or more persons shall not conspire to, or a person shall not:

(a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.

To establish a prima facie case of retaliation, a plaintiff must establish (1) that he was engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 310-311; 660 NW2d 351 (2003).

Initially, we agree that the evidence establishes a question of fact whether plaintiff engaged in protected activity and whether defendant knew about it. Although LaBaere, DiBartolomeo, and Gibson all denied being informed that plaintiff felt that he was being discriminated against because of his race, and the subject of racial discrimination or harassment was not mentioned or discussed at the recorded meeting in February 2018, plaintiff testified that in late 2016 or early 2017 he told DiBartolomeo and LaBaere that he wanted to transfer to another group because Arterburn was singling him out because of his race and causing a hostile work environment. Plaintiff also testified that he told DiBartolomeo that he felt that DiBartolomeo was singling him out because he was Black, and he asked DiBartolomeo why he was singling plaintiff out. Plaintiff further testified that in February 2018, when he spoke to Gibson about his e-mail concerns, he told Gibson that he felt like he was being racially harassed by Arterburn and DiBartolomeo. Additionally, plaintiff testified that his friend, Michael Jordan, told him that he thought plaintiff was being treated differently because of his race, although Jordan denied this. The conflicting evidence created a genuine issue of material fact regarding the first two elements of a prima facie case of unlawful retaliation. Further, plaintiff was subjected to an adverse employment action because he was terminated from his employment.

At issue is whether plaintiff created a genuine issue of material fact that his alleged protected activity caused the adverse employment action. "To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Rymal v Baergen*, 262 Mich App 274, 303; 686 NW2d 241 (2004) (quotation marks and citation omitted). This "can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Id*.

Plaintiff argues that he established a question of fact regarding causation because his prior complaints were sent to Berndtson for review during the investigation that resulted in plaintiff's termination. Plaintiff specifically relies on e-mail exchanges between Marsh and plaintiff, and

between Marsh and Gibson, as evidence that his termination was causally related to his prior complaints.

On February 1, 2018, plaintiff sent an e-mail to Marsh, an HR business partner. Plaintiff stated that he wanted to share with Marsh "off the record" a situation with DiBartolomeo and some restrictions that DiBartolomeo had put in place for plaintiff. Although plaintiff's new manager was Sunda, DiBartolomeo was still providing input regarding the restrictions because plaintiff's performance review for 2017 had not yet been completed. Plaintiff explained that DiBartolomeo did not believe that plaintiff was completing his work when he worked from home and thought that he was not working a full eight hours while in the office. DiBartolomeo restricted plaintiff from working from home, restricted plaintiff's lunch hour to 30 minutes, and required plaintiff to produce a physician's note if he took a sick day. Plaintiff explained the incident in December 2017, when plaintiff asked to work from home the last day before winter break and DiBartolomeo denied his request. However, plaintiff denied receiving DiBartolomeo's e-mail denying the request. Plaintiff was concerned about his year-end performance review and his reputation considering that he was working for a new manager.

Gibson forwarded this e-mail to another HR representative on August 29, 2018, during the decision-making process regarding plaintiff's termination, stating that he had attached plaintiff's "complaint" about DiBartolomeo. Gibson stated that plaintiff's complaint about DiBartolomeo was investigated and determined to be unfounded, because plaintiff's "bad behaviors" had been well documented. However, there was nothing in plaintiff's e-mail or Gibson's e-mail that mentioned a complaint of race discrimination. Therefore, this e-mail does not support an inference of a causal connection between plaintiff's protected activity in 2017 and early 2018, and his termination in September 2018.

At that meeting, which plaintiff recorded without the other participants' knowledge, Gibson expressed concern that plaintiff wanted to postpone discussion of plaintiff's complaint against DiBartolomeo until after his year-end performance review. After Gibson informed plaintiff that he had received a positive rating on his review, plaintiff expressed his happiness and stated that he did not care if he ever worked from home again. Neither plaintiff nor the other participants mentioned any complaints of race discrimination during this meeting. Further, plaintiff did not present any evidence of retaliatory conduct between the February 2018 meeting and his termination in September 2018.

Berndtson testified that progressive discipline is not available for salaried employees and that Last Chance Letters are typically used to deal with behavioral issues, such as rude conduct in meetings, attendance issues, or intoxication on the job. Berndtson further explained that Last Chance Letters are not form documents, but are given out on a case-by-case basis, and that the context of the employee's behavior dictated whether a Last Chance Letter was offered. Berndtson testified that another employee had been terminated immediately after sending an e-mail with a picture of a box of Cocoa Krispies with a picture of a Black man on the box.

We first consider the seven-month gap between plaintiff's alleged protected activity and his termination, the absence of any alleged acts of retaliation following the alleged protected activity until plaintiff's termination, and plaintiff's admitted satisfaction with the positive performance review that he received in February 2018 after his participation in the alleged

protected activity. We juxtapose this with plaintiff's undisputed dissemination of the offensive e-mail to more than 2,000 employees in August 2018, and LaBaere's and Berndtson's explanations of the decision-making process and the ultimate decision to terminate plaintiff's employment because of the e-mail. We agree with the trial court that plaintiff failed to establish a genuine issue of material fact regarding any causal link between plaintiff's earlier complaints against Arterburn and DiBartolomeo, and the termination of his employment. Accordingly, the trial court did not err by dismissing plaintiff's claim for retaliation.

## IV. HOSTILE ENVIRONMENT

Finally, plaintiff argues that the trial court erred by dismissing his hostile-work-environment claim. We disagree.

To establish a prima facie case of a hostile work environment, a plaintiff must prove that (1) the plaintiff belonged to a protected group, (2) the plaintiff was subjected to communication or conduct on the basis of the protected characteristic, (3) the communication or conduct was unwelcome, (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the plaintiff's employment or created an intimidating, hostile, or offensive work environment, and (5) respondeat superior. *Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993). For the fourth element, whether a hostile work environment existed is "determined by whether a reasonable person, in the totality of circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive employment environment." *Id*. at 394.

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quinto v Cross & Peters Co*, 451 Mich 358, 370 n 9; 547 NW2d 314 (1996) (quotations and citation omitted). The party opposing a motion for summary disposition must present more than conclusory allegations that "would permit the conclusion that there was such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Id*. at 371-372.

Plaintiff's argument that defendant created a hostile work environment is based on (1) DiBartolomeo's accusations that plaintiff performed "poor work" and failed to work an eight-hour day, in effect "stealing time"; (2) Arterburn bragging about his family owning a plantation with slaves; (3) Arterburn speaking to plaintiff in a condescending manner; and (4) Arterburn telling plaintiff that he had input on plaintiff's performance reviews. Plaintiff also argues that white coworkers made multiple design mistakes and "came and went as they pleased into the office," without any repercussions and were not restricted from working from home.

Plaintiff established that he belonged to a protected group. In addition, plaintiff's testimony that Arterburn shared his family history of owning and auctioning slaves supports a finding that plaintiff was subjected to unwelcome communications on the basis of his race. However, plaintiff failed to present any evidence that DiBartolomeo's comments about plaintiff not putting in a full day's work or performing poorly, or that Arterburn speaking condescendingly

-12-

to plaintiff were based on plaintiff's race. Plaintiff also argues that white employees were allowed to work from home for any reason, left their workstations for hours without reprimand, and were given many opportunities to correct mistakes, whereas he was held accountable and punished for any of these same actions. As evidence of this disparate treatment, plaintiff relies on his own deposition testimony of his observations of unidentified white employees. Plaintiff was required to present more than conclusory allegations that "would permit the conclusion that there was such conduct or communication of a type or severity that a reasonable person could find that a hostile work environment existed." *Quinto*, 451 Mich at 371-372. A reasonable person could not reach the conclusion that a hostile environment existed on the basis of the evidence submitted by plaintiff, which consisted of nothing more than his own self-serving testimony. *Major*, 316 Mich App at 551.

The fifth element may be established when the employer had or should have had notice of the communications or conduct. Plaintiff testified that in late 2016 or early 2017, he told DiBartolomeo and LaBaere that he wanted to transfer to a new group within the electrical department because he "felt that [he] was being singled out because of [his] race." However, plaintiff admittedly did not share with DiBartolomeo or LaBaere any specific circumstances that made him feel that he was being singled out because of his race, or mention Arterburn's conversations about his family owning or auctioning slaves. Although plaintiff may have established a genuine issue of material fact regarding whether defendant had notice of plaintiff's complaints of race discrimination, he did not establish a genuine issue of material fact regarding whether defendant had notice of a hostile work environment caused by Arterburn's comments and conduct. Accordingly, the trial court did not err by dismissing plaintiff's hostile-work-environment claim.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly